UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| USHA HOLDINGS, LLC AND ATUL BHATARA,<br><br>                                        Plaintiffs,<br><br>                    -against-<br><br>FRANCHISE INDIA HOLDINGS, LIMITED, FRANCORP<br>ADVISORS PRIVATE LIMITED, AND GAURAV MARYA,<br>                                        Defendants. | Civ No.:12 CV 3492 (KAM)(CLP) |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

### Table of Contents

INTRODUCTION .................................................................................................................. 1

PROCEDURAL HISTORY ................................................................................................... 2

FACTUAL BACKGROUND ................................................................................................. 2

    1.   Bhatara Negotiated With Francorp International, Inc., A Non-Party,
        To Procure A License ................................................................................................ 2

    2.   Bhatara Contacted Marya in India to Discuss An Opportunity With
        The License ............................................................................................................... 3

    3.   Marya and Bhatara Discussed the Possibility of Forming a
        Joint-Venture in India .............................................................................................. 4

    4.   Bhatara Also Sought to Involve Marya in a Deal Involving Famous
        Famiglia Pizza Corp. ................................................................................................ 4

    5.   The Draft MOU ........................................................................................................ 4

    6.   After FAPL Was Formed in India, Bhatara Planned a Meeting With
        Francorp ................................................................................................................... 5

    7.   The Unsigned "Draft Agreement" ........................................................................... 5

    8.   Bhatara and Marya Met Boroian at Francorp's Illinois Headquarters ..................... 6

    9.   After the Licensing Agreement Was Signed, Bhatara Refuted the "Draft" ............. 6

    10.  Bhatara Commenced an Arbitration in Illinois Against Marya ............................... 7

THE DEFENDANTS LACK A NEXUS WITH NEW YORK ............................................. 7

    1.   Neither Franchise India, Nor FAPL, Has a Presence in New York ......................... 8

    2.   Bhatara Fraudulently Deceived Marya Into Traveling to New York ....................... 9

ARGUMENT ...................................................................................................................... 10

I. PLAINTIFFS' SERVICE IS DEFECTIVE DUE TO THEIR FRAUD ......................... 10

II. THIS COURT CANNOT EXERCISE PERSONAL JURISDICTION
OVER FRANCHISE INDIA OR FAPL ............................................................................ 10

1. This Court Cannot Exercise General Jurisdiction Over the
   Corporate Defendants .................................................................................12

2. This Court Cannot Exercise Specific Jurisdiction Over the
   Corporate Defendants .................................................................................12

    A.   Defendants Lack On-Going Contractual Relationship with a New
   York Corporation ...............................................................................13

    B.   The "Draft" Was Not Negotiated in New York........................................13

    C.   The Choice-of-Law Clause and the Sending of Notices and Payments .............14

3. The Exercise of Jurisdiction Over the Defendants Would Not Comport
   With Due Process.........................................................................................15

    A.   Defendants Lack the Requisite Minimum Contacts With This State ...................15

    B.   This Suit Would Offend "Traditional Notions of Fair Play and
   Substantial Justice"............................................................................16

        (i)   Litigation in New York Would be Unduly Burdensome...........................17

        (ii)  New York's Interest in This Action.............................................17

        (iii) The Plaintiffs' Interest in Obtaining Relief ...............................17

        (iv) The Interstate Judicial System's Interest In Obtaining The Most
   Efficient Resolution Of Controversies And The Shared Interest
   Of The Several States In Furthering Fundamental Substantive
   Social Policies.................................................................18

III.  DISMISSAL IS WARRANTED PURSUANT TO THE DOCTRINE
OF *FORUM NON CONVENIENS* .....................................................................18

1. Little Deference Should be Accorded to the Plaintiffs' *MOST RECENT*
   Choice of Forum ........................................................................................18

2. An Adequate Alternative Forum Exists.........................................................20

3. The Private and Public Interest Factors Weigh in Favor of Dismissal .............21

    A.   The Private Interest Factors ..................................................................21

        (i)   The Relative Ease of Access to Evidence Favors Arbitration
   in India ..........................................................................21

        (ii)  The Cost to Transport Witnesses to Trial .....................................22

|  |  | (iii) | The Availability of Compulsory Process for Unwilling Witnesses | 22 |

(iv)   Any Judgment Would Be Enforced in India ............................................... 22

(v)    Other Factors That Make the Trial More Expeditious or Less Expensive ........................................................................... 23

B.    The Public Interest Factors ................................................................................ 23

(i)    The Eastern District Undeniably is Congested ............................................ 23

(ii)   Applying Indian Law Would be an Unnecessary Burden For This Court .................................................................................... 23

(iii)   A New York Jury Should Not Be Burdened by Deciding This Case Which Has No Impact on Their Community ........................... 24

(iv)   This Action Does Not Involve a Local Dispute ......................................... 25

IV.  PLAINTIFF'S BREACH OF CONTRACT AND CONVERSION CLAIMS SHOULD BE DISMISSED ............................................................................................... 25

1.    Plaintiffs' Breach of Contract Claim .................................................................... 25

A.    The "Draft" Contains Unequivocal Express Reservations of the Right Not to be Bound ....................................................................................... 28

B.    Whether There Has Been Partial Performance of the Contract ............................ 28

C.    All of the Terms of the Alleged Contract Have Not Been Agreed Upon ............. 29

D.    Whether the Agreement at Issue is the Type of Contract That is Usually in Writing ....................................................................................... 29

3.    Plaintiffs' Conversion Claim Should be Dismissed ............................................. 29

A.    Plaintiffs' Claim is Barred by the Applicable Statute of Limitations ................... 29

B.    Indian Law Does Not Recognize a Civil Tort Claim For Conversion ................... 30

C.    If the "Draft is Enforceable, Plaintiffs' Remedy Is For Breach of Contract ....................................................................................... 30

CONCLUSION ....................................................................................................................... 30

## Table of Authorities

### Federal Cases

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998) ................................ 26, 27

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996) ......................... 11

*Alcoa S. S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 154 (2d Cir. 1978) ......................................... 19

*Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) ........................................ 19

*Aquiline Cap. Partners, LLC v. Finarch LLC*, No. 11 Civ. 3684, 2012 WL 1764218,
    at *4 (S.D.N.Y. May 17, 2012) ................................................................................ 14, 15, 17

*Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–72 (2d Cir.1989) .................................... 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................................... 25

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03-CIV-1537 (MBM),
    2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ......................................................................... 28

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784
    (2d Cir. 1999) ................................................................................................ 10, 11, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-6 (2007) ............................................................................ 25

*C.S.B. Commodities, Inc. v. Urban Trend (HK), Ltd.*, 626 F. Supp. 2d 837,
    849-850 (N.D. Il. 2009) ....................................................................................................... 11

*Chrysler Capital Corp. v. Southeast Hotel Prop., Ltd. P'ship*, 697 F. Supp. 794,
    800-01 (S.D.N.Y. 1988) ....................................................................................................... 26

*Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997) .................................... 26, 27

*Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F.Supp. 1051,
    1060 (S.D.N.Y. 1996) .......................................................................................................... 25

*Cohen v. Lehman Bros. Bank*, 273 F.Supp.2d 524, 528 (S.D.N.Y.2003) ................................................. 27

*Connolly v. Kinay*, 2012 WL 1027231, at *8 (S.D.N.Y. Mar. 27, 2012) ................................................... 21

*Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers*,
    No. 10 Civ. 3789(ILG)(RER), 2012 WL 3537009, at *6 ........................................................ 25

*Diversapack LLC v. Elite Staffing, Inc.*, No. 11–CV–2482 (SIF)(ETB), 2012 WL 1032687,
    at *7 (E.D.N.Y. Mar. 20, 2012) ........................................................................................... 13

*Drake v. Lab. Corp. of Am.*, 2008 WL 4239844, at *5-6 (E.D.N.Y. Sep. 11, 2008) ................................. 16

*Erausquin v. Notz, Stucki Mgmt. Ltd.*, 806 F. Supp. 2d 712, 726-7 (S.D.N.Y. 2011) ............................... 21

*Estate of Davis v. Trojer*, No. 99 Civ. 11056(JSM)(KNF), 2001 WL 829872,
    at *2 (S.D.N.Y. July 20, 2001) ............................................................................................. 30

*Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 541, 553 (S.D.N.Y. 2005) ....................................... 11

*Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) .......................................... 25

*Galet v. Carolace Embroidery Prod. Co., Inc.,* No. 91 Civ. 7991(SS),
   1994 WL 542275, at *4 (S.D.N.Y. Oct. 5, 1994) ........................................................ 30

*Gosian v. State Bank of India,* 689 F. Supp. 2d 571 584 (S.D.N.Y. 2010) .......................... 21

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 (1984) ...................... 12

*Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC,* No. 04–CV–1621,
   2005 WL 1377853, at *7 (S.D.N.Y. June 9, 2005) ................................................... 27

*ICC Indus., Inc. v. Israel Discount Bank, Ltd.,* 170 Fed. Appx. 766, 768 (2d Cir. 2006) .......... 19

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945) ........................................ 11

*Ioannides v. Marika Maritime Corp.,* 928 F. Supp. 374, 379 (S.D.N.Y. 1996) ...................... 20

*Iragorri v. United Tech. Corp.,* 274 F.3d 65, 71 (2d Cir. 2001) ................................. 18

*Kaplan v. Vincent,* 937 F. Supp. 307, 312 (S.D.N.Y. 1996) ........................................ 26

*Krauth v. Exec. Telecard, Ltd.,* 890 F.Supp. 269, 293 (S.D.N.Y.1995) ............................. 27

*Landoil v. Alexander Serv., Inc.,* 918 F.2d 1039, 1043 (2d Cir. 1991) ............................ 12

*Langsam v. Vallarta Gardens,* No. 08 Civ. 2222 (WCC), 2009 WL 8631353,
   at *4 (S.D.N.Y. June 15, 2009) .................................................................. 19

*Lyons v. Rienzi & Sons, Inc.,* No. 09-CV-4253, 2012 WL 1393020,
   at *4 (E.D.N.Y. Apr. 23, 2012) ............................................................. 11, 15

*Morrison Law Firm v. Clarion Co., Ltd.,* 158 F.R.D. 285, 287 (S.D.N.Y. 1994) ..................... 19

*Nielsen Media Research, Inc. v. Microsys. Software, Inc.,* No. 99–CV–10876,
   2002 WL 31175223, at *6 (S.D.N.Y. Sep. 30, 2002) ............................................... 27

*Niv v. Hilton Hotels Corp.,* 710 F. Supp. 2d 328, 347 (S.D.N.Y. 2008) ............................ 23

*Online Payment Solutions Inc. v. Svenska Handelsbanken AB,* 638 F. Supp. 2d 375,
   382 (S.D.N.Y. 2009) ............................................................................ 19

*Optimal U.S. Litig.,* No. 10 Civ. 4095(SAS), 2012 WL 3264372, at *1
   (S.D.N.Y. Aug. 10, 2012) ................................................................ 18, 20, 24

*Paine Webber, Inc. v. WHV, Inc.,* 95 CIV 0052, 1995 WL 296398, at *3
   (S.D.N.Y. May 16, 1995) ........................................................................ 14

*Palacios v. The Coca-Cola Co.,* 757 F. Supp. 2d 347, 352 (S.D.N.Y. 2010) ..................... 19, 23

*Palmer v. Globalive Commc'n Corp.,* No. 07 CIV 038 (MGC), 2008 WL 2971469,
   at *7 (S.D.N.Y. Aug. 1, 2008) .................................................................. 14

*Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122, 123 (2d Cir 2008) ........................... 16

*R.G. Grp., Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir. 1984) ........................... 26

*Rubenstein v. Clark & Green,* No. 1:08-CV-0337, 2010 WL 298239,
   at *3 (N.D.N.Y. Jan. 19, 2010) ................................................................. 26

*Ruggles v. Wellpoint Inc.,* 253 F.R.D. 61, 65 (N.D.N.Y.2008) ..................................... 25

*Rule v. Brine, Inc.,* 85 F.3d 1002, 1010 (2d Cir.1996) ........................................... 27

v

*Scottish Air Int'l., Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224,
    1232 (2d Cir. 1996) ........................................................................................................ 19

*Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996) .................................................................. 26

*Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183-4 (5th Cir. 1992)......................... 11

*Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F. Supp. 491, 498 (S.D.N.Y.1987) ........................... 27

*Terlizzi v. Brodie,* 329 N.Y.S.2d 589, 590 (2d Dep't 1972)............................................. 10

*Tese-Milner v. AD EFX Promotions, Inc.,* No. 06-CIV-1630 (DLC),
    2007 WL 196866, at *5 (S.D.N.Y. Jan. 26, 2007) ...................................................... 13

*Upstate Networks, Inc. v. Early,* No. 6:11-CV-01154 (LEK/DEP), 2012   WL 3643843,
    at *6 (N.D.N.Y. Aug. 23, 2012) ............................................................................... 14

*Vacold LLC v. Cerami,* 545 F.3d 114, 124–25 (2d Cir. 2008)............................................ 27

*Westvaco Corp. v. United Paperworkers Int'l Union, Local 1388,* 424 F. Supp. 250,
    257 (S.D.N.Y. 1976) .............................................................................................. 18

*Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir 1986)............................... 26, 27

*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 102 (2d Cir. 2000)................................ 19

**State Cases**

*Clark–Fitzpatrick v. Long Isl. R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653,
    516 N.E.2d 190 (1987) ........................................................................................... 30

*Komolov v. Segal,* 96 A.D.3d 513, 947 N.Y.S.2d 14, 15 (1st Dep't 2012); CPLR § 214(3)...................... 30

*Notaro v. Sterling Transp. Serv., LLC,* 34 Misc.3d 1211(A), 943 N.Y.S.2d 793, 792
    (Sup. Ct. Qns. Cty. 2012)........................................................................................ 23

**Rules**

N.Y. Civ. Prac. L. & Rules § 301 (McKinneys 2000)......................................................... 12

N.Y. Civ. Prac. L. & Rules § 302 (McKinneys 2000)......................................................... 12

N.Y. Civ. Prac. L. and Rules § 4102(a) (McKinneys 2000) ................................................ 24

Defendants Franchise India Holdings, Limited ("Franchise India"), Francorp Advisors Private Limited ("FAPL"), and Gaurav Marya ("Marya"), by their counsel, Eckert Seamans Cherin & Mellott, LLC, submit this Memorandum of Law in support of their Motion for an Order: (a) dismissing Plaintiffs' Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(2) and/or 12(b)(5), for lack of personal jurisdiction and/or insufficient service of process; (b) dismissing Plaintiffs' Complaint, pursuant to the doctrine of *forum non conveniens,* and directing that the dispute herein be resolved in India; (c) dismissing Plaintiffs' claims for breach of contract and conversion, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim; (d) dismissing all claims against Franchise India because, as set forth below, it has no involvement whatsoever with the transaction at issue in Plaintiff's Complaint; and/or (e) in the alternative, if this Court concludes that the unsigned, draft agreement between the parties (upon which Plaintiffs' breach of contract claims are premised) is binding, then this case should be dismissed in light of the forum selection clause which calls for the resolution of disputes by arbitration in India.

## INTRODUCTION

Plaintiffs USHA Holdings, LLC ("USHA") and Atul Bhatara ("Bhatara") commenced this action to recover damages for the alleged breach of a purported, unsigned "draft agreement" between Marya and USHA.  Plaintiffs also seek damages for alleged conversion, and they seek equitable relief.[1]

This action involves a dispute regarding the operation of FAPL, an Indian company, which operates in India.  The Defendants are all domiciled in India and do not conduct business in New York.  The only tangential connection that the Defendants have to New York is the fact that Marya stopped in New York, *en route,* from New Dehli to Chicago -- at Bhatara's request -- to meet with a non-party to this action.

---

[1] Plaintiffs seek the following equitable relief: (i) the imposition of a constructive trust upon money in India that Defendants purportedly generated in connection with the License held by FAPL (Compl. ¶¶ 67-70); (ii) an injunction limiting the conduct of Marya, Franchise India, and FAPL with respect to their conduct overseas (Compl. ¶¶ 77-88); and (iii) a Declaratory Judgment that Bhatara owns fifty percent of FAPL and is entitled to equal rights in the management thereof.  (Compl. ¶¶ 71-76.)

## PROCEDURAL HISTORY

Plaintiffs commenced this action by filing a Summons and Complaint in the Supreme Court of the State of New York, Queens County on June 4, 2012.  (Pelliccio Decl. ¶ 3; Compl., Ex. 1)[2]  Plaintiffs deceived Marya into traveling to New York for purported settlement discussions on June 16, 2012; when he arrived, no discussions occurred.  Instead, they simply served him with the Summons and Complaint.  (Marya Decl. ¶¶ 58-67[3]; Pelliccio Decl. ¶ 4; Affs. Of Service, Ex. 2)

Defendants filed a timely Notice of Removal, pursuant to 28 U.S.C. Section 1446(b)(1), on July 13, 2012.  (Pelliccio Decl. ¶ 5; Notice of Removal, Ex. 3)  This Motion is filed in accordance with this Court's Order dated September 25, 2012.  No other matters have transpired since this action was removed.

## FACTUAL BACKGROUND

1.    **Bhatara negotiated with Francorp International, Inc., a non-party, to procure a license**

In or about 2008, Bhatara negotiated with Francorp International, Inc. ("Francorp"), an Illinois-based non-party, to procure a license (the "License") for franchising opportunities solely within the Republic of India.  Bhatara simultaneously attempted (unsuccessfully) to re-sell the License at a profit to many businesses in India, including, but not limited to, a business controlled by S.K. Jain ("Jain") and one controlled by Amit Sabharwall ("Sabharwall").  In this regard, Bhatara sought to re-sell the License to Jain, Sabharwall, and others at a price above and beyond that which he agreed to pay Francorp and to thereby generate a profit. Indeed, Bharata even showed Marya his proposed contract with Jain. (Marya Decl.¶¶4- 5)

After Bhatara's negotiations with Jain, Sabharwall, and others collapsed, Francorp's Chief Executive Officer, Donald Boroian ("Boroian"), referred Bhatara to Marya.  Francorp knew Marya.  In fact, in 2006, Francorp's President, Ramon Vinay ("Vinay"), contacted Marya in India and attempted to sell him

---

[2] True and correct copies of all numbered exhibits referenced herein are attached to the Declaration of Richard J. Pelliccio.

[3] The Marya Declaration refers to the Declaration of Defendant Gaurav Marya, who is a principal of Franchise India and the Managing Director of FAPL.

2

the very same licensing opportunity that Bhatara now sought to sell. Although Vinay had sought to sell it to

Marya at a significantly lower amount than Bhatara did, Marya nevertheless declined. (Marya Decl. ¶ 6)

**2.      Bhatara Contacted Marya In India To Discuss An Opportunity With The License**

Further to Boroian's recommendation, Bhatara contacted Marya in India to discuss a possible

business opportunity in India involving the License. (Marya Decl. ¶ 5) Although Bhatara purportedly is

domiciled in New York (Compl. ¶ 2), he had been living in India for quite some time in connection with,

among other things, medical treatment that he sought there. While he was in India, Bhatara called Marya

and asked to meet him with respect to the Francorp License. (Marya Decl. ¶ 7)

In August or September of 2008, Bhatara and Marya had an initial meeting in the Intercontinental

Hotel in New Delhi. The following day, they met again at Marya's office in New Delhi to discuss the

Francorp License. (Marya Decl. ¶ 8) Many of their discussions were conducted in Hindi. Moreover,

Bhatara informed Marya that he had retained Amarchand & Mangaldas, a prominent law firm in India,

which he consulted with respect to the possible transaction involving the License. (Marya Decl. ¶ 8)

During the foregoing discussions, Bhatara disclosed that he had paid Francorp a sum of money as

a down payment toward purchasing the License by a certain date. If he did not purchase it by that date, he

would have lost his down payment. Therefore, having failed to close deals with Jain, Sabharwall, and

others, he was eager to secure an agreement with Marya before his deadline passed. (Marya Decl. ¶ 9)

Marya informed Bhatara that he was not interested in purchasing the License from him. Marya

stated that he had declined an earlier offer from Vinay to buy the License directly from Francorp for

substantially less money than Bhatara now sought for it. (Marya Decl. ¶ 10)

In addition, Marya was concerned about legal and financial difficulties that Francorp was

experiencing. These difficulties, together with Mr. Boroian's plea agreement with the United States

Attorney in Illinois, made Marya wary of investing in Francorp. (Marya Decl. ¶ 10)

3

3.    **Marya and Bhatara discussed the possibility of forming a joint-venture in India**

Although Marya was not interested in purchasing the License, he and Bhatara discussed an alternative plan: the possibility of creating an Indian-based joint venture which would hold the License and would attempt to monetize it by securing opportunities solely within India.  (Marya Decl. ¶ 11)  This new company would be created under Indian law, would maintain its sole office in New Dehli, and it would enter into any licensing agreement with Francorp that might come to fruition.  These discussions between Bhatara and Marya occurred in India.  (Marya Decl. ¶ 11)

4.    **Bhatara also sought to involve Marya in a deal involving Famous Famiglia Pizza Corp.**

Simultaneously with the discussions in India regarding the Francorp License, Bhatara also sought to arrange a deal with Marya for franchise opportunities in India involving Famous Famiglia Pizza Corp. ("Famiglia"). Bhatara stated that he and/or his company, USHA, possessed an interest in Famiglia.  He also stated that Famiglia planned to operate franchises in India and sought partners in connection therewith. However, Marya told Bhatara that he was not interested in a deal with Famiglia. (Marya Decl. ¶ 13)

5.    **The Draft MOU**

In connection with the preliminary discussions that Bhatara and Marya had in India, on September 17, 2008, Marya sent (from India) an e-mail to Bhatara which attached a one-page document entitled "Terms of MOU" (hereinafter, "MOU")  (Marya Decl. ¶ 14; MOU, Ex. A)[4]  This document, which was never signed, provides, in relevant part: "Atul Bhatara & Gaurav Marya will structure India JV [*i.e.,* joint venture] to represent & Operate [sic] Francorp license in India....Both parties will sign MOU which will be binding for JV structure and License Agreement." (MOU ¶¶ 1, 3)

As noted, all discussions between Marya and Bhatara with respect to the terms delineated in the draft MOU occurred in India.  (Marya Decl. ¶ 18)

---

[4] True and correct copies of all lettered exhibits are attached to the Marya Declaration.

4

6.      **After FAPL Was Formed In India, Bhatara planned a meeting with Francorp**

FAPL was formed in India on October 7, 2008.   (Marya Decl. ¶ 19; Certificate of Incorp., Ex. B)  In the meantime, Bhatara arranged for Marya to meet him and Boroian at Francorp's Illinois headquarters in November of 2008 to discuss the possible issuance of the License to FAPL.  (Marya Decl. ¶ 20)  While Marya was inclined to fly directly from New Delhi to Chicago, Bhatara pleaded with him to stop-over for a day in New York in order to meet his purported contacts at Famiglia.   (Marya Decl. ¶ 21)  Although Marya was not interested in a deal with Famiglia (and had expressed this to Bhatara unequivocally), he nonetheless accommodated Bhatara's request.  (Marya Decl. ¶ 22)  Thus, on November 1, 2008, Marya flew from New Dehli, India to New York, and he landed on the 2nd.  (Marya Decl. ¶ 22)  In the morning of November 3rd, in order to accommodate Bhatara's request, Bhatara and Marya had a brief meeting with Famiglia.  Famiglia discussed the launch of their franchise in India and their anticipated participation in a trade show in New Dehli later that month.  (Marya Decl. ¶ 22)  As expected, no deal arose from this meeting, as Marya had no interest in a relationship with Famiglia.  (Marya Decl. ¶ 22)

7.      **The unsigned "Draft Agreement"**

In the interim, on November 1, 2008, Marya's colleague, Deepika Handa, e-mailed Bhatara a "Draft Commercial Agreement" (hereinafter, the "Draft").  (Marya Decl. ¶ 23)  In her e-mail, Ms. Handa stated: "I am enclosing herein, the *Draft* Commercial Agreement for your perusal and comments, if any."  (Marya Decl. ¶ 24; Handa's  Nov. 1st e-mail and the "Draft", Ex. C) (emphasis added).

Ms. Handa is a legal advisor for Franchise India.  Her ministerial act of sending the "Draft" to Bhatara on Marya's behalf  is Franchise India's only "involvement" in this matter.  The "Draft" does not state that Franchise India was to be a party to any contract.  Indeed, the "Draft" does not even mention Franchise India.  Franchise India has no involvement with the proposed transaction at issue in Plaintiffs' Complaint. (Marya Decl. ¶ 25)

5

The "Draft," upon which Plaintiffs' breach of contract claims are premised, was never signed by any party.  Moreover, Marya did not intend for it to be a binding agreement, and accordingly, its express terms provide unequivocally that it was not a binding contract between him and USHA.  (Marya Decl. ¶ 26)  For example, on page 1, the "Draft" expressly provides:

> This Agreement sets out the broad mutual understanding between the parties and _reflects only the terms that are presently proposed_ by the parties concerned in order to set up standards and solutions for setting up and formation of a Joint Venture Company (JVC) in India.  _The binding Agreement,_ stipulating the terms of this Agreement, _will arise and be executed only when_ all material rights, obligations, terms & conditions have been mutually agreed to and set forth in a "Definitive Agreement"[5] including the Shareholders Agreement, License Agreement and other such Agreements as the parties may mutually agree to execute from time to time.

All terms of the "Draft" were discussed with Bhatara while he was in India.  (Marya Decl. ¶ 30)

## 8.    Bhatara and Marya met Boroian at Francorp's Illinois headquarters

After meeting with Famiglia in the morning of November 3rd, Marya and Bhatara flew to Chicago that afternoon to meet with Boroian at Francorp's headquarters in Illinois.  (Marya Decl. ¶ 30)  Marya and Bhatara met with Francorp's representatives in Illinois on November 4th and 5th.  (Marya Decl. ¶ 33)

On November 5th, Boroian and Marya, on behalf of Francorp and FAPL, respectively, executed a licensing agreement (the "Licensing Agreement") in Illinois.  (Marya Decl. ¶ 35)  By its terms Francorp granted to FAPL the License for the Republic of India.  (Marya Decl. ¶ 35; Licensing Agreement, Ex. D)  The Licensing Agreement was not negotiated in New York.  (Marya Decl. ¶ 36)

## 9.    After the Licensing Agreement was signed, Bhatara refuted the "Draft"

Although Plaintiffs' breach of contract claims are premised upon the "Draft," Plaintiffs never even accepted its terms.  Clearly, there was no meeting of the minds, and there certainly was not any partial performance.  (Marya Decl. ¶ 38)

---

[5] "Definitive Agreement" is defined in Article 1, Section 1.4 as "the Agreement(s), Shareholders Agreement, Direct License Agreement and such other like Agreements _to be executed by the parties_ which they mutually agree to execute from time to time." (emphasis added)

In this regard, after November 5, 2008, Bhatara returned to India for extended periods.   Marya and Bhatara met in Hyperdad, India on or about February of 2009, in Chandigarh, India on or about May of 2009, and in the Shangri-La Hotel in New Dehli on or about June of 2009.  (Marya Decl. ¶ 39)  Each time, Bhatara stated that he was not interested in actively participating in the proposed operations of FAPL, and, notwithstanding his current claims, he did not seek shares in FAPL.  Instead, he sought, once again, to sell the License to Marya.  Marya was not interested in this.  (Marya Decl. ¶ 39)

Even more significantly, after the Francorp Licensing Agreement was signed, Bhatara returned to India and attempted to re-sell the License to Sabharwall.  (Marya Decl. ¶ 39)  Thus, while Bhatara now disingenuously claims that the "Draft" was a binding contract, he has consistently refuted its terms.

**10.     Bhatara commenced an arbitration in Illinois against Marya**

Marya and Bhatara could not come to an agreement. (Marya Decl. ¶ 40)   Recognizing that there was no binding contract between Marya and Bhatara (or between any corporate entity associated with them), Bhatara tried unsuccessfully to sue Marya for breach of contract by filing a Demand for Arbitration (the "Demand") in Illinois dated July 11, 2011.  (Marya Decl. ¶ 40; Demand for Arbitration, Ex. E)  As set forth in the Demand, Bhatara tried to recover from Marya the $400,000 franchise fee that he purportedly paid to Francorp.  (Marya Decl. ¶ 41)  In his Demand, he described the "Nature of the Dispute" as "Franchise fee and breach of contract."  *See* Ex. E.

Bhatara sought to arbitrate his dispute with Marya in Chicago, pursuant to the arbitration clause in Section 23 of the License Agreement between Francorp and FAPL, notwithstanding the fact that neither he nor Marya are parties to that contract.  (Marya Decl. ¶ 42)  Indeed, that arbitration was dismissed because Bhatara and Marya are not parties to the Licensing Agreement. (Marya Decl. ¶43; 2-2-12 Arb. Order, Ex. F)

## THE DEFENDANTS LACK A NEXUS WITH NEW YORK

Marya is a citizen of the Republic of India, and he is domiciled in New Dehli.  He does not own any property in New York.  (Marya Decl. ¶ 44)

7

Marya is the Managing Director of Franchise India.  Franchise India is a closely-held private, corporation.  All of its shareholders are members of Marya's family, and they all reside in India.  Franchise India is organized under the laws of the Republic of India and has its principal place of business in New Dehli.  (Marya Decl. ¶¶ 45-46)  Franchise India assists investors who seek franchise opportunities by, among other things, brokering business relationships and holding trade exhibitions. (Marya Decl. ¶ 47)

Franchise India had no involvement with the facts giving rise to this action, and it continues to have no such involvement.  (Marya Decl. ¶ 48)  As noted, Franchise India is not mentioned at all in the "Draft," upon which Plaintiffs' breach of contract claims are premised.

FAPL is a closely-held, private corporation.  Marya and his brother own the shares thereof.  His brother is an Indian citizen, and he resides solely within India.  (Marya Decl. ¶ 49)  FAPL is organized under the laws of the Republic of India and maintains its sole place of business in New Dehli.  (Marya Decl. ¶ 50)

**1.  Neither Franchise India, nor FAPL, has a presence in New York**

Neither FAPL, nor Franchise India, has: (i) employees or agents in New York; (ii) bank accounts in New York; (iii) telephone numbers in New York; or (iv) offices in New York.  (Marya Decl. ¶ 51)  Neither company is licensed to conduct business in New York, and, in fact, neither has conducted business in New York.  Neither company solicits business within New York.  Indeed, FAPL was established in India for the sole purpose of conducting business in India.  (Marya Decl. ¶¶ 52-53)

Neither the "Draft," nor any aspect of Plaintiffs' "relationship" with Defendants was negotiated in New York.  These discussions occurred in India.  (Marya Decl. ¶ 56)

In addition to Marya's brief to New York on November 2, 2008 to meet with Famiglia, he also visited New York on June 16, 2012.  Marya was lured into New York to attend purported settlement discussions with Bhatara.  It was at this time that Plaintiffs served him with the Summons and Complaint.(Marya Decl. ¶ 57)  He would not have been in New York, but for being hoodwinked by them.

8

2.    __Bhatara fraudulently deceived Marya into traveling to New York__

After Bhatara's failed attempt to arbitrate with Marya, Bhatara began to threaten Boroian with litigation.  (Marya Decl. ¶ 58; *see also* the 4/22/12 e-mail from Boroian to Marya, Ex. J to Pls.' Compl.)  In light of this threat, in the spring of 2012, Boroian repeatedly began asking Marya to meet with Bhatara in order to resolve this dispute.  Marya replied that he owed Bhatara nothing.  (Marya Decl. ¶ 59)

Marya planned to be in Las Vegas in mid-June of 2012 for an event, which was unrelated to this litigation.  As he was going to be in the United States, he agreed to Bhatara's request to come to New York for a purported meeting to resolve this dispute.  (Marya Decl. ¶ 60)

Franchise India was already participating in an event in New York in June of 2012.  This event, the International Franchise Expo, had been held annually in Washington, D.C. but moved to New York in 2012.  It is organized by MFV Expositions ("MFV").  This show was unrelated to FAPL's business.  Moreover, this show was unrelated to the "Draft" and the License. By this point, Plaintiffs and Defendants had no relationship.  (Marya Decl. ¶ 61)

Marya did not plan to attend the New York show.  Instead, Sumit Gupta, an employee of Franchise India, was to attend.  Mr. Gupta is not an officer of Franchise India, and he is not authorized to accept service of Summonses and Complaints on Franchise India's behalf, let alone on behalf of FAPL, of which he is not an officer or employee.  (Marya Decl. ¶ 63)

Although Marya did not plan to attend the New York show, nevertheless, based upon Bhatara's invitation to have settlement negotiations in New York, he decided to leave the Las Vegas show early and meet Bhatara in New York.  (Marya Decl. ¶ 64)  Bhatara sent an e-mail to Marya and Boroain on June 11, 2012 in which he stated: "Gaurav and Don: I would like to set up a meeting with the both of you to see if we can amicably resolve our issues with regard to Francorp India [*i.e.,* FAPL].  Please let me know your availability and when you would like to meet." (Marya Decl. ¶ 65; Bhatara's 6/11/12 e-mail, Ex. G)

With respect to this proposed meeting, Boroain replied in an e-mail dated June 13, 2012: "I

will be happy to join you both. *It is imperative that we work together to resolve this issue....*" (Marya Decl. ¶ 66; *see also* Ex. G) ((emphasis added).

Marya, Bhatara, and Boroian agreed to meet at 7:00 p.m. in the Hilton on Avenue of the Americas. When Marya arrived, Boroian was not present, and no meeting occurred. Instead, Marya was met by a process server who handed him the Summons and Complaint. Indeed, Bhatara had orchestrated the alleged meeting merely in order to serve Marya with the Summons and Complaint for this action. Had Marya known that Bhatara did not seek fruitful discussions, and instead, merely sought to hoodwink him into accepting service, he would not have left Las Vegas and come to New York.   (Marya Decl. ¶ 67)

## ARGUMENT

### I
### PLAINTIFFS' SERVICE IS DEFECTIVE DUE TO THEIR FRAUD

For the reasons set forth above, Plaintiffs' attempted service upon Marya, FAPL, and Franchise India is void and should be quashed, pursuant to Rule 12(b)(5). It is well-settled that "where a defendant has been lured into this jurisdiction by fraud or deceit in order that he may be served, the service so effected is invalid. *Terlizzi v. Brodie,* 329 N.Y.S.2d 589, 590 (2d Dep't 1972). Dismissal is warranted.

### II
### THIS COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER FRANCHISE INDIA OR FAPL

Even if this Court holds that service was valid, dismissal still is warranted vis-à-vis FAPL and Franchise India because this Court cannot exercise personal jurisdiction over them. When responding to a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir. 1999).

In diversity cases, the court's ability to exercise personal jurisdiction over the defendants is determined by the law of the forum state. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996)  Under New York law, courts resolving issues of personal jurisdiction must

engage in a two-part analysis. First, they must determine whether there is jurisdiction over the foreign

defendant.  Second, they must determine whether an exercise of jurisdiction under these laws is consistent

with federal due process requirements. *Bank Brussels,* 171 F.3d at 784.

   "The due process inquiry is of especial utility when the putative lack of personal jurisdiction is

raised as a defense in a case brought in New York, since the state's 'long-arm statute does not extend in all

respects to the constitutional limits established by *International Shoe Co. v. Washington,* 326 U.S. 310

(1945)." *Lyons v. Rienzi & Sons, Inc.,* No. 09-CV-4253, 2012 WL 1393020, at *4 (E.D.N.Y. Apr. 23, 2012)

(quoting *Licci ex rel. Licci v. Lebanese Can. Bank, SAL,* 2012 WL 688809, at *5 (2d Cir. Mar. 5, 2012)).

   Indeed, the mere service upon Marya in New York, even if, *arguendo,* it is valid (which Defendants

dispute), does not dispense with the Due Process inquiry vis-à-vis the corporate defendants.  *See, e.g.,*

*Estate of Ungar v. Palestinian Auth.,* 400 F. Supp. 541, 553 (S.D.N.Y. 2005); *C.S.B. Commodities, Inc. v.*

*Urban Trend (HK), Ltd.,* 626 F. Supp. 2d 837, 849-850  (N.D. Il. 2009) (service within the forum upon

president of foreign corporation still requires existence of minimum contacts with the forum for the exercise

of personal jurisdiction); *Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183-4 (5th Cir. 1992) (same).

   Given the foregoing, a personal jurisdiction analysis is warranted under New York law with respect

to the corporate Defendants. The New York statutes governing personal jurisdiction are New York Civil

Practice Law and Rules ("CPLR") Section 301, which covers general jurisdiction, and Section 302, which

covers specific jurisdiction.  As set forth below, neither statute confers personal jurisdiction over FAPL or

Franchise India.  Moreover, even if, *arguendo,* personal jurisdiction existed, Defendants respectfully submit

that the exercise of such jurisdiction would not comport with the Due Process Clause of the Fourteenth

Amendment.

1.     **This Court cannot exercise general jurisdiction over the corporate defendants**

CPLR Section 301 provides: "A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  N.Y. Civ. Prac. L. & Rules § 301 (McKinneys 2000). General jurisdiction may be found where a "defendant's contacts with the forum state are substantial, continuous, and systematic."  *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 (1984).

Courts consider the following factors to determine whether general jurisdiction exists under Section 301: (a) the existence of an office; (b) the solicitation of business; (c) the presence of bank accounts or other property, and (d) the presence of employees or agents in the state.  *Landoil v. Alexander Serv., Inc.,* 918 F.2d 1039, 1043 (2d Cir. 1991). However, the "[s]olicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services." *Id.*

For the reasons set forth above, this Court cannot exercise general jurisdiction over FAPL or Franchise India, as they lack employees, property, *etc.* in New York and do not conduct business here.

2.     **This Court cannot exercise specific jurisdiction over the corporate defendants**

Plaintiffs suggest that Marya's visit to New York in November of 2008 confers specific jurisdiction pursuant to CPLR Section 302(a)(1) (Compl. ¶¶ 22-23), notwithstanding the fact that he was in New York, at Bhatara's bequest, to meet with Famiglia, and Plaintiffs' claims have nothing to do with Famiglia.

A court may exercise specific jurisdiction over foreign defendants under New York's long-arm statute, CPLR Section 302, which provides, in relevant part:

> (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state.

N.Y. Civ. Prac. L. & Rules § 302 (McKinneys 2000).

For the exercise of specific jurisdiction under Section 302(a)(1), a plaintiff's claim must "arise from" the particular business activity.  *Tese-Milner v. AD EFX Promotions, Inc.,* No. 06-CIV-1630 (DLC), 2007 WL

196866, at *5 (S.D.N.Y. Jan. 26, 2007).  A claim "arises from" a particular transaction when there is "some articulable nexus between the business transacted and the cause of action sued upon," or when "there is a substantial relationship between the transaction and the claim asserted."  *Id.* (citation omitted).

The question of whether an out-of-state defendant transacts business in New York is determined by considering a variety of factors, including: (a) whether the defendant has on-going contractual relationship with a New York corporation; (b) whether the contract was negotiated or executed in New York, and whether, *after* executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (c) what the choice-of-law clause is in any such contract; and (d) whether the contract requires [defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. Although all of these factors are relevant, no one factor is dispositive.  *Bank Brussels,* 171 F.3d at 787.

A.    <u>**Defendants lack on-going contractual relationship with a New York corporation**</u>

Franchise India does not have (and never had) *any* relationship with the Plaintiffs, let alone an on-going contractual relationship.  (Marya Decl. ¶ 54)  Moreover, neither Marya, nor FAPL, has an on-going contractual relationship with the Plaintiffs.  (Marya Decl. ¶ 54)  The "Draft" was not a binding contract; at best, it was a non-binding "agreement-to-agree," and it was never executed by any party.  Moreover, according to Plaintiffs, all communications between the parties ceased two weeks later on November 14, 2008.  (Compl. ¶ 33)  Clearly, there was (and is) no "on-going contractual relationship" between the parties.

B.    <u>**The "Draft" was not negotiated in New York**</u>

In addition, as set forth exhaustively above, the "Draft" was not negotiated in New York.  All discussions pertaining to it occurred in India.  Moreover, Marya's November 2nd visit to New York does not amount to transacting business.  *See, e.g., Diversapack LLC v. Elite Staffing, Inc.,* No. 11–CV–2482 (SIF)(ETB),  2012 WL 1032687, at *7 (E.D.N.Y. Mar. 20, 2012) ("The fact that a meeting occurred in New York is insufficient to demonstrate personal jurisdiction ....."); *Paine Webber, Inc. v. WHV, Inc.,* 95 CIV

13

0052, 1995 WL 296398, at *3 (S.D.N.Y. May 16, 1995) ("Occasional meetings in the forum state that are exploratory, unproductive, or insubstantial are insufficient to establish requisite contacts with the state."); *Palmer v. Globalive Commc'n Corp.,* No. 07 CIV 038 (MGC), 2008 WL 2971469, at *7 (S.D.N.Y. Aug. 1, 2008 (defendant's trip to New York to sign a non-binding letter of intent is insufficient to confer jurisdiction); *Aquiline Cap. Partners, LLC v. Finarch LLC,* No. 11 Civ. 3684, 2012 WL 1764218, at *4 (S.D.N.Y. May 17, 2012) (defendant's exploratory meetings in New York which led to nothing beyond a proposal, which itself was subject to further negotiation, did not amount to "transacting business.").

Pursuant to the cases set forth above, Marya's November 2nd visit to New York, which did not give rise to a signed, binding contract, does not confer personal jurisdiction.  Moreover, the purpose of this visit was to meet Famiglia; it had nothing to do with the "Draft" or the License, and Plaintiffs' claims do not "arise out of" that brief meeting with Famiglia in New York.  (Marya Decl. ¶ 22)

Similarly, Marya's visit to New York on June 16, 2012 does not confer jurisdiction, even if the Court were to hold that a contract had come into existence, as a matter of law, by that time.  Firstly, he would not have been in New York, but for Bhatara's fraud.  Secondly, the 2012 visit was for matters unrelated to the "Draft" and License; it was for an alleged settlement meeting regarding a soured relationship.  (Marya Decl. ¶ 57)  Clearly, the 2012 visit does not confer jurisdiction.  See *Upstate Networks, Inc. v. Early,* No. 6:11-CV-01154 (LEK/DEP), 2012  WL 3643843, at *6 (N.D.N.Y. Aug. 23, 2012) (meetings in the forum state *subsequent* to the formation of the contract do not confer jurisdiction unless they are essential to the business relationship or at least substantially advance it.)

C.      The choice-of-law clause and the sending of notices and payments

The "Draft's" choice-of-law clause calls for the resolution of disputes by arbitration in India under Indian law.  (Agreement Art. 10)  Although the "Draft" calls for notices to be sent to Bhatara and USHA at their New York address (Agreement Art. 9.8 ), it does not state if any payments would be sent, let

alone where such payments would be sent.  However, Bhatara had a rupee-denominated bank account in India, and he volunteered that information to Marya.  (Marya Decl. ¶ 76)

Given the foregoing, this Court cannot exercise specific jurisdiction over Franchise India and FAPL.

3.    **The exercise of jurisdiction over the Defendants would not comport with Due Process**

Even if, *arguendo,* personal jurisdiction exists over Franchise India and FAPL, this Court's exercise of jurisdiction would violate their Due Process rights under the Fourteenth Amendment.

To satisfy due process requirements, a state may constitutionally exercise jurisdiction over non-domiciliary defendants, provided: (1) that such defendants have "certain minimum contacts" with the forum state and (2) that the maintenance of a suit does not offend "traditional notions of fair play and substantial justice."  *Aquiline*, 2012 WL 1764218, at *4 (citing *Int'l Shoe v. Washington,* 326 U.S. 310 (1945)).

As set forth below, the Defendants lack the requisite minimum contacts with New York, and litigating in this forum would offend "traditional notions of fair play and substantial justice."

A.    **Defendants lack the requisite minimum contacts with this state**

In undertaking the minimum-contacts analysis, " 'it is essential ... that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' Such purposeful conduct provides a defendant with fair warning that he and his property may be subject to the exercise of that forum state's power." *Lyons,* 2012 WL 1393020, at *4.  "The principal inquiry ... is whether the defendant's activities manifest an intention to submit itself to the power of a sovereign.... " *Id.*

The test for "minimum contacts" has come to rest on whether a defendant's "conduct and connection with the forum state" are such that a defendant "should reasonably anticipate being hauled into court there." *Aquiline*, 2012 WL, at *10 (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)). The "minimum contacts" test protects a defendant against the burdens of litigating in a distant and inconvenient forum. *Id.*

15

Defendants respectfully submit that, for the reasons set forth exhaustively above, they lack sufficient minimum contacts with New York. Plaintiffs initiated this entire transaction by traveling to India and seeking out Defendants. This transaction was to involve business conducted solely within India and has nothing to do with New York. Clearly, the Indian-domiciled Defendants could not "reasonably anticipate being hauled into court" in New York. This is underscored by the "Draft's" forum selection clause which provides for the resolution of disputes in India under Indian law. This is critical to the due process analysis. For example, in *Aqualine*, 2012 WL 1764218, at *4, the Court held that the exercise of jurisdiction over foreign defendants would have violated due process since "[t]here is no evidence that the Defendants could have foreseen being led to court in New York in connection with a proposed transaction in Belgium that expressly provided that they would be governed by Belgian law."

Under facts similar to this case, courts have found that the exercise of personal jurisdiction would contravene the defendants' Due Process Rights. *See, e.g., Drake v. Lab. Corp. of Am.*, 2008 WL 4239844, at *5-6 (E.D.N.Y. Sep. 11, 2008); *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 123 (2d Cir 2008).

**B.      This suit would offend "traditional notions of fair play and substantial justice"**

Even if, *arguendo*, the Defendants had the requisite minimum contacts with this state, such contacts alone do not satisfy due process. *Drake*, 2008 WL 4239844, at *4. Indeed, even if a defendant has minimum contacts, the prospect of defending a suit in the forum state must also comport with traditional notions of fair play and substantial justice. *Metr. Life Ins. Co.*, 84 F.3d at 568 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The United States Supreme Court has articulated the following test to determine whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice:

> A court must consider the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. It must also weigh in its determination the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

*Aquiline,* 2012 WL, at *11 (citing *Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102, 113 (1987)).

### (i)     Litigation in New York would be unduly burdensome

Litigating this case in New York would pose a significant burden on the Defendants.  They are all domiciled in India, and, the corporate Defendants are small, closely-held corporations.  FAPL has eighteen employees, all of whom are based in New Dehli.  (Marya Decl. ¶¶ 68-71)  Many of the potential witnesses to this action who are employed by FAPL speak Hindi, as their primary language and therefore, would require interpreters.  (Marya Decl. ¶ 72)

Moreover, given the limited number of persons employed by FAPL, transporting them from India to New York for extended periods to testify at trial would significantly disrupt FAPL's ability to conduct routine business operations. This is particularly true, as it pertains to Marya who runs the Defendants.  Because of the burdens associated with litigation outside of India, Marya specifically sought an India forum selection clause in the "Draft."  (Marya Decl. ¶¶ 73-74)

### (ii)     New York's interest in this action is extremely tenuous

New York has an extremely tenuous interest in this action.  Although Plaintiffs are New York citizens, they traveled to India to seek business opportunities there.  India's interest, by contrast,  is substantial.  This action involves  Indian companies which conduct business in India.  Moreover, this dispute will be resolved by Indian law.  India, therefore, has substantial interests in ensuring that its law is properly applied and that business is conducted in that country in accordance with its laws.

### (iii)     The Plaintiffs' interest in obtaining relief

The Plaintiff's interest in obtaining relief would be served by arbitrating in India, as mandated by the "Draft," which Plaintiffs claim is binding.  Indeed, Plaintiffs' inclination to arbitrate is substantiated by the fact that they initially attempted to litigate this dispute by commencing arbitration proceedings in Illinois.

Furthermore, Plaintiffs specifically sought a business opportunity in India, and therefore, they clearly

contemplated that any litigation would be resolved there, as set forth unmistakably in the "Draft."

> (iv)   **The interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies**

The Eastern District's docket is unmistakably substantial. Therefore, alleviating it by sending this

case to arbitration in India, is clearly in its interest. Indeed, in other contexts, Courts routinely hold that the

"arbitration of disputes is favored." *Westvaco Corp. v. United Paperworkers Int'l Union, Local 1388,* 424

F. Supp. 250, 257 (S.D.N.Y. 1976).

Given the foregoing, the exercise of personal jurisdiction would violate Due Process.

## III
## DISMISSAL IS WARRANTED PURSUANT TO THE DOCTRINE OF *FORUM NON CONVENIENS*

Even if personal jurisdiction exists and is consistent with Due Process, Defendants respectfully

submit that dismissal is warranted pursuant to the doctrine of *forum non conveniens.*

Federal courts have the power to dismiss actions under the common-law *forum non conveniens*

doctrine ... in cases where an adequate alternative forum exists abroad. *In re Optimal U.S. Litig.,* No. 10

Civ. 4095(SAS), 2012 WL 3264372, at *1 (S.D.N.Y. Aug. 10, 2012) (citations omitted). The "decision to

dismiss by reason of *forum non conveniens* is confided to the sound discretion of the district court." *Id.*

The Second Circuit employs a three-part test in addressing such motions. *Id.* First, Courts must

determine the degree of deference accorded to the plaintiff's choice of forum. Second, Courts must

consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties'

dispute. Lastly, Courts balance the private and public interests implicated in the choice of forum." *Id.*

**1.**   **Little deference should be accorded to the Plaintiffs' *MOST RECENT* choice of forum**

A plaintiff's choice of forum is generally entitled to deference when the plaintiff has sued in the

plaintiff's home forum. *Iragorri v. United Tech. Corp.,* 274 F.3d 65, 71 (2d Cir. 2001) (citing *Koster v. Am.*

*Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947)). However, Courts do "not assign talismanic significance to the citizenship or residence of the parties." *Palacios v. The Coca-Cola Co.,* 757 F. Supp. 2d 347, 352 (S.D.N.Y. 2010). *See also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir. 1996) (complaint filed by closely-held New York corporation and its principal was properly dismissed on fnc grounds); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir. 1993) (dismissing New York plaintiff's complaint); *Alcoa S.S. Co., Inc. v. M/V Nordic Regent,* 654 F.2d 147, 154 (2d Cir. 1978) (plaintiff's New York residence did not preclude fnc dismissal); *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 102 (2d Cir. 2000) ("These cases do not reflect a rigid rule of decision protecting a U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*).

Moreover, less deference is accorded to a plaintiff's choice of forum where the plaintiff is a corporation doing business abroad, where the plaintiff can expect to litigate in foreign courts, the plaintiff sought out the transaction, and/or where the action is not in tort. *ICC Indus., Inc. v. Israel Discount Bank, Ltd.,* 170 Fed. Appx. 766, 768 (2d Cir. 2006) (fnc dismissal was warranted and less deference was properly given to New York plaintiff's choice of its own home forum because it decided to invest in an Israeli company, to guaranty a loan to an Israeli bank, and because it was foreseeable that Israeli law will apply); *Langsam v. Vallarta Gardens,* No. 08 Civ. 2222 (WCC), 2009 WL 8631353, at *4 (S.D.N.Y. June 15, 2009) (dismissing New York plaintiff's action brought for breach of contract for purchase of home in Mexico); *Online Payment Solutions Inc. v. Svenska Handelsbanken AB,* 638 F. Supp. 2d 375, 382 (S.D.N.Y. 2009) (holding that where the New York plaintiff chose to establish and operate his corporation in Sweden and England, he should "not be surprised that he would need to litigate the corporation's claims in those jurisdictions"); *Morrison Law Firm v. Clarion Co., Ltd.,* 158 F.R.D. 285, 287 (S.D.N.Y. 1994) (dismissing Complaint filed by New York law firm and its proprietor which had sought out business opportunities in Japan with Japanese defendants).

This case involves the breach of a purported contract between USHA[6] and Marya for work to be performed in India.[7]  As noted, Plaintiffs sought out the relationship with Marya.  (Marya ¶¶ 6-7)  Moreover, the purported "Draft" calls for disputes to be arbitrated in India pursuant to Indian law.  This is significant. *See, e.g., Ioannides v. Marika Maritime Corp.,* 928 F. Supp. 374, 379 (S.D.N.Y. 1996) (the fact that plaintiffs' decedents, Greeks who died when their commercial vessel sank, agreed to sue only in Greece diminishes the weight that otherwise would be accorded to the plaintiffs' choice of forum).

In light of the cases cited above, the facts of this case warrant significantly diminished, if any, deference to Plaintiffs' choice of forum.  This is particularly true since litigating in New York wasn't even Plaintiffs' initial choice of forum.  Instead, Plaintiffs initially sought to arbitrate in Illinois.

**2.    An adequate alternative forum exists.**

The second step in the *forum non conveniens* analysis is to determine "whether an adequate alternative forum exists." *In re Optimal U.S. Litig.,* 2012 WL 3264372, at *2. "The defendant bears the burden of establishing that a presently available and adequate alternative forum exists." *Id.*

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Id.* (citations omitted). "An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy this requirement, and only on rare occasions will the alternative forum ... be so unsatisfactory that the forum is inadequate." *Id.*

In this case, Defendants agree to arbitrate in India and service upon them is not an issue. (Marya Decl. ¶ 67)  Obviously, an Indian arbitrator would "permit litigation of this dispute."  Moreover, it is well-settled that Indian *courts* are an adequate alternative forum. *See, e.g., Gosian v. State Bank of India,* 689

---

[6] Bhatara is not a party to the purported agreement.  Therefore, he lacks standing to assert breach of contract claims.  Any such claim belongs to USHA.

[7] As set forth, *infra,* the conversion claim should be dismissed for numerous reasons, including, but not limited to, the fact that it is barred by the three-year statute of limitations and because generally, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *See, e.g., Clark–Fitzpatrick v. Long Isl. R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

F. Supp. 2d 571 584 (S.D.N.Y. 2010) (citing *In re Union Carbide Corp. Gas Plant Disaster at Bhopal,* 809 F.2d 195, 202-03 (2d Cir. 1987). It goes without saying that *arbitration* in India is an adequate alternative.

3.   **The private and public interest factors weigh in favor of dismissal**

In the third step of the *forum non conveniens* analysis, the defendants must establish that a balancing of the private and public interest factors heavily favors the alternative forum. *Erausquin v. Notz, Stucki Mgmt. Ltd.,* 806 F. Supp. 2d 712, 726-7 (S.D.N.Y. 2011). These factors favor dismissal in this case.

A.   **The private interest factors.**

The Second Circuit considers the following private interests: (i) the relative ease of access to evidence; (ii) the cost to transport witnesses to trial; (iii) the availability of compulsory process for unwilling witnesses; and (iv) other factors that make the trial more expeditious or less expensive." *Id.* The place where any judgment will be enforced also is a factor to consider. *Connolly v. Kinay,* 2012 WL 1027231, at *8 (S.D.N.Y. Mar. 27, 2012). *See also Alstate,* 994 F.2d at 1001(that "any judgment ... will have to be enforced in Australia where all of the [defendants'] assets are located" weighed in favor of dismissal).

In considering the foregoing factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Id.* However, "the concentration of evidence [overseas] weighs heavily in favor of dismissal." *Id.*

(i)   **The relative ease of access to evidence favors arbitration in India**

The subject transaction involves an Indian corporation's business conducted in India. Thus, it goes without saying that relevant documents and witnesses are located in India.

Moreover, arbitrating in India would not be a burden for Bhatara. As set forth above, he has spent considerable time in India; he has already retained an Indian law firm; he has at least one bank account in India. Lastly, while he obviously speaks Hindi (Marya Decl. ¶ 8), the arbitration would be conducted in English. ("Draft" Art. 10.3)

21

### (ii)    The cost to transport witnesses to trial

Since the bulk of witnesses, other than Plaintiff, are located in India, the cost of transporting them would be significantly less if this case is arbitrated in India. Moreover, given the limited number of persons employed by FAPL, transporting them from India to New York for extended periods to testify at trial would significantly disrupt its ability to conduct routine business operations. As set forth above, this is particularly true, as it relates to Marya, who runs FAPL and Franchise India. (Marya Decl. ¶ 74) Indeed, given the ten hour time difference between New York and New Dehli, Defendants' limited ability to communicate via phone and e-mail would be further compromised.

### (iii)    The availability of compulsory process for unwilling witnesses

Since this action involves the business that an Indian corporation conducts in India, this factor clearly favors arbitration in that country. The Indian entities to whom Bhatara attempted to sell the License (*e.g.,* Jain, Sabharwall, and others) are critical witnesses because they can attest to the fact that there was no meeting of the minds vis-à-vis the "Draft." Clearly, Bhatara never intended to participate in the operation of FAPL, as envisioned in the "Draft." Instead, his intent, at all times, was simply to re-sell the License at a profit. These witnesses also have relevant information vis-a-vis damages. Just as Vinay tried to sell Marya the License for far less than Bhatara did, Bhatara sought different sums from the various persons he sought to re-sell the License to in India. (Marya Decl. ¶ 5) Such Indian-based non-parties will be essential witnesses over whom this Court lacks compulsory process. In fact, non-privileged information held by the Indian law firm, Amarchand & Mangaldas, also would corroborate the foregoing.

### (iv)    Any judgment would be enforced in India

Defendants possess no assets in New York. (Marya Decl. ¶¶ 44, 51) Thus, Plaintiffs would have to enforce any judgment in India.

22

    (v)    **Other factors that make the trial more expeditious or less expensive.**

Notwithstanding this Court's efficiency, private arbitration in India likely would be more expeditious than a trial in this forum.  Moreover, since Hindi is the primary language of many potential witnesses, translators would be required. (Marya Decl. ¶ 64)  This factor favors dismissal.  *See, e.g., Palacios v. The Coca-Cola Co.,* 757 F. Supp. 347, 362 (S.D.N.Y.,2010) (cost of Spanish translation favors dismissal) .

**B.**    **The public interest factors.**

The public factors in the *forum non conveniens* analysis are: (1) court congestion; (2) avoiding difficult problems in conflict of laws and the application of foreign law; (3) the unfairness of imposing jury duty on a community with no relation to the case; and (4) the interest of communities in having local disputes decided at home. *Giro,* 2011 WL 2183171, at *9.  No one factor is dispositive.  *Id.*

    (i)    **The Eastern District undeniably is congested**

As noted, notwithstanding the efficiency of this forum, it is burdened by an extremely voluminous case load.  This case would add an unnecessary burden since the "Draft" requires arbitration in India.

    (ii)    **Applying Indian law would be an unnecessary burden for this Court**

Courts are not required to conclusively decide the issue of conflict of law for the purpose of resolving *forum non* motions. *Niv v. Hilton Hotels Corp.,* 710 F. Supp. 2d 328, 347 (S.D.N.Y. 2008).  If the Court finds that it is *likely* that foreign law would be applied to the case, that factor favors dismissal. *Id.*

In this case, Indian law applies.  The "Draft's" Choice of Law Clause provides: "This Agreement shall be governed by and construed in accordance with the laws of India."  ("Draft" Art. 14.1)  If this Court finds that the "Draft" is enforceable, then the Indian choice of law clause is enforceable with respect to Plaintiff's breach of contract claims.[8]  *See Notaro v. Sterling Transp. Serv., LLC,* 34 Misc.3d 1211(A), 943 N.Y.S.2d 793, 792 (Sup. Ct. Qns. Cty. 2012) (citations omitted) ("New York courts will generally enforce a

---

[8] Moreover, if the Court finds that the "Agreement" is enforceable, then Defendants submit that this case should be dismissed pursuant to the forum selection clause, which calls for arbitration in India.

clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent.)"[9]

Even if this Court holds that the choice-of-law clause does not apply to Plaintiff's tort claim,[10] the conversion claim nevertheless should be resolved pursuant to Indian law since, as set forth, *infra,* it conflicts with New York law.  Indeed, where, as here, there is an actual conflict between the laws invoked by the parties, then the Courts apply New York choice of law rules to determine which state's substantive law controls. *Booking v. Gen. Star Mgmt. Co.,* 254 F.3d 414, 419–20 (2d Cir. 2001).  New York resolves choice-of-law conflicts in tort cases via an "interest analysis" to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'relate to the purpose of the particular law in conflict.'"  *In re Optimal U.S. Litig.,* 2012 WL 3264372, at *3 (citations omitted).

Plaintiffs allege: "In excluding the Plaintiffs from the management and use of the License, the Defendants have improperly converted the License."  (Compl. ¶ 59.)  While Defendants deny this allegation, any such conduct could only have occurred in India.  The Defendants do not conduct business in New York, and they lack contacts with this forum.  (Marya Decl. ¶¶ 45-52)  Therefore, any tort claims should be resolved under Indian law.  Clearly, this factor favors dismissal.

### (iii)  A New York jury should not be burdened by deciding this case which has no impact on their community

Since Plaintiffs commenced this action in state court, they were not required to assert a jury demand in their Summons and Complaint.  *See* N.Y. Civ. Prac. L. and Rules § 4102(a) (McKinneys 2000)

---

[9]Even in the absence of the "Draft's" Choice of Law Clause, Indian law would apply to Plaintiffs' breach of contract claims. In a dispute based in contract, New York applies "[t]he 'center of gravity' or 'grouping of contacts' choice of law theory ...." *2004 Stuart Moldaw Trust v. XE L.I.F.E., LLC,* 642 F. Supp. 2d 226, 236 (S.D.N.Y. 2009) (citations omitted)  Considerations in a grouping of contacts analysis may include the place of contracting, the place of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Id.*  The facts of this case clearly warrant the application of Indian law.

[10]  *Luizzi v. Pro Transp., Inc.,*  No. 02 CV 5388(CLP), 2010 WL 3023928, at *10 (E.D.N.Y. Aug. 2, 2010) (citations omitted) (the contractual choice of law clause typically does not apply to torts).

(a jury demand is asserted in the Note of Issue).  Thus, it is not clear if they intend to seek a jury trial.  If

they do, a New York jury should not be burdened with deciding a matter against Indian Defendants, with

respect to a transaction that Plaintiffs actively sought in India, which involves business conducted outside of

New York, and which is governed by Indian law.

**(iv)      <u>This action does not involve a local dispute</u>**

With respect to the fourth public interest factor, Defendants respectfully submit that this action does

not involve a local dispute.  If anything, this is an Indian dispute, and India has great interest in ensuring the

proper application of its laws to business conducted within its sovereign territory.

Given the foregoing, Defendants submit that the private and public interest factors strongly favor

dismissal, and this action should be dismissed or stayed pursuant to the doctrine of *forum non conveniens.*

IV

**PLAINTIFF'S BREACH OF CONTRACT AND CONVERSION CLAIMS SHOULD BE DISMISSED**

Under a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), a court must

"accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-

moving party[ ]."  *Ruggles v. Wellpoint Inc.,* 253 F.R.D. 61, 65 (N.D.N.Y.2008).  To withstand a motion for

dismissal, a plaintiff must plead facts sufficient to establish that her claim for relief is more than just

conceivable, and is in fact "plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-6 (2007);

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

**1.      <u>Plaintiffs' Breach of Contract Claim</u>**

Under New York law, "a breach of contract claim requires proof of (1) formation of an agreement,

(2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Fischer &*

*Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011); *Coastal Aviation, Inc. v. Commander*

*Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y. 1996).  Moreover, an essential element to the formation of

a contract is a "meeting of the minds" between the parties.  *Dell's Maraschino Cherries Co., Inc. v.*

25

*Shoreline Fruit Growers,* No. 10 Civ. 3789(ILG)(RER), 2012 WL 3537009, at *6 (E.D.N.Y. Aug. 14, 2012).

Indian law also requires the "meeting of the minds" for the existence of a valid contract. (Talwar Decl. ¶ 3)[11]

    In this case, a binding agreement was not formed. "Ordinarily, preliminary manifestations of assent that require further negotiation and further contracts" are not enforceable. *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996); *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998).

    If either party to a proposed contract communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract. *Kaplan v. Vincent,* 937 F. Supp. 307, 312 (S.D.N.Y. 1996). *See also R.G. Grp., Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir. 1984) (dismissing plaintiff's claim to enforce an unsigned franchise contract which stated that it would be binding "when duly executed"); *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir 1986) (dismissing plaintiff's claims to enforce an unsigned agreement, notwithstanding the lack of an express reservation not to be bound, since other writings indicated an intent not to be bound until a contract was signed by all parties); *Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir. 1997) (same); *Chrysler Capital Corp. v. Southeast Hotel Prop., Ltd. P'ship,* 697 F. Supp. 794, 800-01 (S.D.N.Y. 1988) (letter which stated that it would not be binding until certain conditions were met showed intent not to be bound).

    To guide courts in deciding whether a preliminary agreement creates binding obligations, the Second Circuit considers the following factors: (a) whether there has been an express reservation of the right not to be bound in the absence of a writing; (b) whether there has been partial performance of the contract; (c) whether all of the terms of the alleged contract have been agreed upon; and (d) whether the agreement at issue is the type of contract that is usually committed to writing. *Rubenstein v. Clark &*

---

[11] Although the "Agreement" should be construed pursuant to Indian law, there is no conflict between New York and Indian law with respect to the "meeting of the minds" element. Under New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co. v. Am. Home Assur. Co.,* 639 F.3d 557, 566–67 (2d Cir.2011) "If not, no choice of law analysis is necessary." *Id.* Therefore, this analysis is based upon New York law.

*Green,* No. 1:08-CV-0337, 2010 WL 298239, at *3 (N.D.N.Y. Jan. 19, 2010); *Teachers Ins. & Annuity Ass'n*

*v. Tribune Co.,* 670 F. Supp. 491, 498 (S.D.N.Y.1987); *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884

F.2d 69, 71–72 (2d Cir.1989); *Vacold LLC v. Cerami,* 545 F.3d 114, 124–25 (2d Cir. 2008).

The Second Circuit has noted both that "each [factor] provides significant guidance," but the first

factor is the most important in the context of a binding preliminary commitment.  *See Hostcentric Tech., Inc.*

*v. Republic Thunderbolt,* LLC, No. 04–CV–1621, 2005 WL 1377853, at *7 (S.D.N.Y. June 9, 2005); *see*

*also Adjustrite  Sys.,* 145 F.3d at 549 (the first factor is the most important); *Krauth v. Exec. Telecard, Ltd.,*

890 F.Supp. 269, 293 (S.D.N.Y.1995).

In this regard, the key is the intent of the parties: whether the parties intended to be bound, and if

so, to what extent.  *Adjustrite Sys.,* 145 F.3d at 549.  "To discern that intent, a court must look to 'the words

and deeds [of the parties] which constitute objective signs in a given set of circumstances.'"  *Id.* (citing

*Winston,* 777 F.2d at 80).  Subjective evidence of intent, on the other hand, is generally not considered.

*See Rule v. Brine, Inc.,* 85 F.3d 1002, 1010 (2d Cir.1996).

The strongest indication of objective intent arises from an express, written reservation not to be

bound. Thus, "if the language of the agreement is clear that the parties did not intend to be bound, the

Court need look no further." *Cohen v. Lehman Bros. Bank,* 273 F.Supp.2d 524, 528 (S.D.N.Y.2003) (citing

*Arcadian,* 884 F.2d at 72); *Ciaramella,* 131 F.3d at 322 ("if the parties agree not to be bound until an

agreement is set forth in writing and signed, they will not be bound until then."); *Nielsen Media Research,*

*Inc. v. Microsys. Software, Inc.,* No. 99–CV–10876, 2002 WL 31175223, at *6 (S.D.N.Y. Sep. 30, 2002).

In *R.G. Group., Inc.,* 751 F.2d  at 74, the Second Circuit, in dismissing plaintiff's claim to enforce an

unsigned franchise contract (notwithstanding the parties' conceded "handshake deal"), noted: "[I]t is not

surprising that considerable weight is put on a party's explicit statement that it reserves the right to be

bound only when a written agreement is signed.  Courts are reluctant to discount such a clear signal...."

*See also Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03-CIV-1537 (MBM), 2003 WL

27

23018888 (S.D.N.Y. Dec. 22, 2003) ("if the parties intend not to be bound until the agreement is set forth in writing and signed, courts should not frustrate that intent...").

Applying the foregoing rules to this case, Defendants submit that the "Draft" is not enforceable.

### A.      The "Draft" contains unequivocal express reservations of the right not to be bound

The "Draft" could not be any clearer that it is not a binding contract.  As noted, it provides:

> This Agreement sets out the broad mutual understanding between the parties and *reflects only the terms that are presently proposed* by the parties concerned in order to set up standards and solutions for setting up and formation of a Joint Venture Company (JVC) in India.  *The binding Agreement,* stipulating the terms of this Agreement, *will arise and be executed only when* all material rights, obligations, terms & conditions have been mutually agreed to and set forth in a "Definitive Agreement" including the Shareholders Agreement, License Agreement and other such Agreements as the parties may mutually agree to execute from time to time.

Article 2 of the "Draft," which is entitled, *"Proposed Arrangement,"* further provides:

> 2.1 This Agreement is to *pave the way* for the Parties to combine its [sic] expertise to jointly harness the business opportunities in the field of Management Consultancy Services.
> 2.2 The Parties wish to set forth their mutual understanding of the *proposed negotiations,* describe clearly how they intend to proceed and *set forth the conditions that must be met prior to the Parties entering into any formally binding Joint Venture Agreement.*

Article 11 of the "Draft," which is entitled "Exclusivity Period," provides:

> 11.1  The Exclusivity Period is the period of 3 months from the date of the signing of this Agreement during which period the PARTIES will take effective steps to prepare Business Plan, hold dialogues and conduct negotiations on an exclusive basis for and with a view to finalize the proper implementation of the Licensed Business and for entering into the Definitive Agreements.

As noted, this unequivocal intent not to be bound is the most significant factor in this analysis.

### B.      Whether there has been partial performance of the contract.

There has not been any partial performance.  To the contrary, shortly after Bhatara returned to India from Chicago, he refuted the "Draft's" terms and even attempted to re-sell the License to Sabharwall and others.  (Marya Dec. ¶¶ 38-39)  Clearly, there was no partial performance.

C.     **All of the terms of the alleged contract have not been agreed upon**

The term of the "Draft" was left blank ("Draft Agreement Art. 12.1), the nature of "strategic decisions" to be taken by FAPL's board were left for future negotiation ("Draft Agreement Art. 5.3), decisions regarding the transfer of FAPL's shares were left for future negotiation ("Agreement Art. 7.1-7.2). Moreover, the "'Definitive Agreement" including the Shareholders Agreement, License Agreement and other such Agreements as the parties may mutually agree to execute'" was never even drafted.

D.     **Whether the agreement at issue is the type of contract that is usually in writing**

As the Second Circuit has noted, this factor "concerns the extent to which, as a practical business matter, the agreement involved a scale of investment and complexity such that a writing requirement would be expected." *R.G. Group, Inc.,* 751 F.2d at 77.  In fact, in *R.G. Group,* the Second Circuit affirmed the dismissal of Plaintiff's claim to enforce the unsigned franchise agreement because, *inter alia,* in the context of a complex commercial transaction, "a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone." *Id.*

This case entailed the possible establishment of a business overseas.  As *RG Group* suggests, such a complex business arrangement would typically be committed to writing.[12]

3.     **Plaintiffs' conversion claim should be dismissed**

In support of their conversion claim, Plaintiffs allege: "In excluding Plaintiff's from the management and use of the License, the Defendants have improperly converted the license." (Compl. ¶ 59)

A.     **Plaintiffs' claim is barred by the applicable statute of limitations**

Plaintiffs aver: "Subsequent to November 14, 2008, Marya refused to communicate with the Plaintiffs regarding the License/Licensee." (Compl. ¶ 59)  Under New York law, the statute of limitations

---

[12] Lastly, Article 6.1 of the "Draft" provides: "The investment by the parties as toward the JV shall be locked in for a period of 2 years from the date of the investment by USI in the JV." Arguably, therefore, the "Draft" could not be performed within one year, and pursuant to New York General Obligations Law Section 5-701, it had to be memorialized in a signed writing.  Thus, it is unenforceable pursuant to the Statute of Frauds.

for a conversion claim is three years.[14]  *See Komolov v. Segal*, 96 A.D.3d 513, 947 N.Y.S.2d 14, 15 (1st

Dep't 2012); CPLR § 214(3).  Moreover, the statute of limitations begins to run from the date on which the

conversion took place. *See Estate of Davis v. Trojer*, No. 99 Civ. 11056(JSM)(KNF), 2001 WL 829872, at

*2 (S.D.N.Y. July 20, 2001).  "[A] claim for conversion is not continuing in nature." *Galet v. Carolace*

*Embroidery Prod. Co., Inc.*, No. 91 Civ. 7991(SS), 1994 WL 542275, at *4 (S.D.N.Y. Oct. 5, 1994).

In this case, Plaintiffs' purported conversion claim began to run on November 14, 2008 when,

according to their Complaint, Marya purportedly ceased speaking with them regarding the License.

(Compl. ¶ 59)  Thus, the conversion claim already had expired when the Complaint was filed in 2012.

**B.  Indian law does not recognize a civil tort claim for conversion**

The laws of New York and India conflict because that India does not recognize a civil tort claim for

conversion.  (Talwar Decl. ¶ 5.)  As noted, Indian law applies to Plaintiffs' torts claims pursuant to New

York's "interest analysis."  Thus, dismissal of the conversion claim is warranted.

**C.  If the "Draft" is enforceable, Plaintiffs' remedy is for breach of contract**

If this Court found that the "Draft" is enforceable, and if it found that New York law applies to this

action, dismissal of the conversion claim is still warranted.  In this regard, generally, a breach of contract

will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *See*

*Clark–Fitzpatrick v. Long Isl. R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

**CONCLUSION**

Defendants respectfully request that this Court grant this Motion in its entirety.

Dated: October 11, 2012

Eckert Seamans Cherin & Mellott, LLC

By: _Richard J. Pelliccio_

Karl F. Milde, Jr., Esq.
Richard J. Pelliccio, Esq.

---

[14] Although Indian law applies to this action, "[u]nder New York law, a choice of law clause is construed as choosing only the applicable substantive law," and statutes of limitations "are regarded as part of the forum's procedure." *Ins. Co. of N. Am. v. ABB Power Generation, Inc.*, 925 F.Supp. 1053, 1059 (S.D.N.Y.1996) (citation omitted); *Gilman v. Marsh & McLennan Co.s, Inc.*, No. 10 Civ. 8158(JPO), 2012 WL 2166114, at *14 (S.D.N.Y. June 15, 2012).