UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
USHA HOLDINGS, LLC, and ATUL BHATARA

           Plaintiffs,

  - against –

FRANCHISE INDIA HOLDINGS LIMITED,
FRANCORP ADVISORS PRIVATE LIMITED, AND
GAURAV MARYA,

           Defendants.
----------------------------------------X

**MATSUMOTO, United States District Judge:**

<u>**MEMORANDUM & ORDER**</u>
12-CV-3492 (KAM)

      Plaintiffs USHA Holdings, LLC ("USHA") and Atul Bhatara ("Bhatara") brought suit against defendants Franchise India Holdings, Limited ("Franchise India"), Francorp Advisors Private Limited ("FAPL"), and Gaurav Marya ("Marya") in the Supreme Court of New York, Queens County, by filing a Summons and Complaint dated June 14, 2012.[1] On July 13, 2012, defendants removed this case to the United States District Court for the Eastern District of New York. (ECF No. 1, Notice of Removal, 7/13/12.) Defendants subsequently moved to dismiss this case, arguing (i) that service was defective, (ii) that the court lacked personal jurisdiction, (iii) that dismissal was warranted under the doctrine of *forum non conveniens*, (iv) that plaintiffs did not enter into any contract with defendants and could not satisfy the statute of frauds, and (v) that plaintiffs'

---

[1] The Notice of Removal states this suit was filed on June 4, 2012 but the Complaint is dated June 14, 2012.

conversion claim was duplicative of the breach of contract claim

and barred by the relevant statute of limitations.  Defendants'

motion was fully briefed on March 4, 2013.  For the reasons

provided below, defendants' motion to dismiss plaintiffs'

conversion claim is granted, but defendants' motion to dismiss

plaintiffs' breach of contract claim is denied, and defendants'

motion to dismiss the case for improper service, lack of

personal jurisdiction, and under the doctrine of *forum non*

*conveniens* is denied.

## BACKGROUND

Many of the facts giving rise to this lawsuit are

vigorously contested by the parties.  In determining the facts

relevant to defendants' motion to dismiss for lack of personal

jurisdiction, the court has considered the Complaint and the

various declarations and other evidence submitted by the

parties.[2]  Additionally, the court has construed the evidence in

the light most favorable to plaintiffs, resolving all doubts in

plaintiffs' favor.  *CutCo Indus., Inc. v. Naughton,* 806 F.2d

361, 365 (2d Cir. 1986); *see also Realuyo v. Abrille*, 93 F.

App'x 297, 298 (2d Cir. 2004) (summary order) ("The court must

---

[2] In deciding a motion to dismiss for lack of personal jurisdiction pursuant
to Federal Rule of Civil Procedure 12(b)(2), the court may rely upon
materials that are outside the pleadings, including any affidavits submitted
by the parties.  *See DiStefano v. Carozzi North Am., Inc.*, 286 F.3d 81, 84
(2d Cir. 2001); *Villanova v. Harbilas*, No. 08-cv-10448, 2010 U.S. Dist. LEXIS
37797, at *6-7 (S.D.N.Y. Apr. 13, 2010).

construe the pleadings and affidavits in [plaintiff's] favor.");
*DiStefano*, 286 F.3d at 84.

### I.    The License Agreement and the Parties

Francorp International, Inc. ("Francorp"), which is
not a party to this case, is a company that provides services
and plans for operating and managing franchises. (Declaration
of Atul Bhatara ("Bhatara Dec.") ¶¶ 2-3.) Francorp represents
many large companies such as Bridgestone Tires, Buffalo Wild
Wings, and Popeye's Chicken. (*Id.* ¶ 3.) Donald Boroian is the
president of Francorp, which is based in Illinois. (Declaration
of Donald Boroian ("Boroian Dec.") ¶ 1.)

Bhatara was born and raised in Queens, New York,
graduated from high school in Queens, then graduated from St.
John's University in Queens, and resides in Queens. (Bhatara
Dec. ¶¶ 92-94.) Bhatara has cerebral palsy, needs the
assistance of companions to travel within India, and had
experimental surgery performed on his legs, which cannot support
the weight of his torso. (*Id.* ¶¶ 97-98, 103.) USHA is a New
York LLC based in Queens, New York, and is the business entity
used by Bhatara to conduct his investments. (*Id.* ¶ 91.)

Marya is domiciled in New Delhi, India. (Declaration
of Gaurav Marya ("Marya Dec.") ¶ 44.) Marya is the principal
and managing director of Franchise India and the managing
director of FAPL. (*Id.* ¶¶ 1, 45-46.)

Franchise India is a private, closely-held corporation organized under the laws of the Republic of India with its principal place of business in New Delhi, India. (*Id.* ¶ 46.) All of the shareholders of Franchise India are relatives of Marya who reside in India. (*Id.* ¶ 45.) Franchise India assists investors who seek franchise opportunities by holding trade exhibitions and helping to broker business transactions. (*Id.* ¶ 47.) The company markets itself as the "World's #1 Franchise Site" and boasts partnerships with at least 6,930 global franchising opportunities, including the "Sesame Street Preschool" program and the Kenny Rogers Roasters franchise. (Bhatara Dec. ¶¶ 61-63.)

FAPL is a closely held, private corporation organized under the laws of the Republic of India on October 7, 2008, with its sole place of business in New Delhi, India. (Marya Dec. ¶¶ 19, 49-50.) Marya claims he and his brother own all of the shares of FAPL. (*Id.* ¶ 49.) But other evidence in the record, including an agreement signed by Marya on behalf of FAPL and Boroian on behalf of Francorp, shows that Marya owns 50 percent of the shares of FAPL and Bhatara owns 50 percent of the shares of FAPL. (Bhatara Dec., Ex. B.) Marya claims FAPL has 18 employees, all of whom are based in New Delhi. (Marya Dec. ¶ 70.)

## II.  Negotiations Between Marya and Bhatara

Francorp was offering to sell a license that granted the purchaser the exclusive territorial right to implement Francorp's franchise consulting and development services within the Republic of India (the "License").  (Bhatara Dec. ¶ 2.) Bhatara claims that he and USHA purchased the License from Francorp on or about September 12, 2008, in exchange for a payment of $400,000.  (*Id.* ¶ 15 & Ex. A; Boroian Dec. ¶¶ 5, 15.) A March 11, 2011 letter from Boroian to Bhatara states that Bhatara initially paid a $50,000 fee as an option for the License and $400,000 to purchase the License.  (Bhatara Dec., Ex. A.)

After purchasing the License, Bhatara contacted Marya to discuss the use of the License.  (*Id.* ¶ 19.)  Marya claims, and plaintiffs do not dispute, that he and Bhatara had an initial meeting to discuss the license in New Delhi in "August or September of 2008," that they met the following day at Marya's office in New Delhi to discuss the License, and that Bhatara informed Marya that he had retained Amarchand & Mangaldas, a prominent law firm in India, in connection with a possible transaction involving the License.  (Marya Dec. ¶ 8.) During these discussions in India, Marya informed Bhatara that he was not interested in purchasing the License from him, but Marya and Bhatara also discussing creating a joint venture based

in India that would hold the License and use the License in India. (*Id.* ¶¶ 10-11.) The parties envisioned that this joint venture would be created under Indian law, maintain its sole office in New Delhi, and enter into any licensing agreement with Francorp for the License. (*Id.* ¶ 11.)

## A. Draft Memorandum of Understanding

On September 17, 2008, Marya sent an e-mail to Bhatara that included a one-page document entitled "Terms of MOU" (the "MOU") as an attachment. (*Id.* ¶ 14 & Ex. A.) The MOU, which neither Marya nor Bhatara signed, provided that "Atul Bhatara & Gaurav Marya will structure India JV to represent & Operate Francrop [sic] license in India," that "[b]oth parties will hold 50% is [sic] the India JV," and that "[b]oth Parties will sign MOU which will be binding for JV structure and License Agreement." (*Id.*, Ex. A.) The MOU sent by Marya also stated that the joint venture would transfer $30,000 to Bhatara immediately upon the signing of the license agreement and $270,000 to Bhatara within one year of the signing. (*Id.*) Marya now claims that he "was not willing to invest such a sum in order to purchase the License." (*Id.* ¶ 12.)

The draft MOU called for the new Indian joint venture to be incorporated under the name "Usha Management consultants." (*Id.*, Ex. A.) But Marya stated that he and Bhatara subsequently

discussed forming the joint venture under the name "Francorp Advisors Private Limited." (*Id.* ¶ 17.) FAPL was formed in India on October 7, 2008. (*Id.* ¶ 19.)

### B. Meetings between Bhatara and Marya

On November 1, 2008, Marya flew from New Delhi, India to New York, landing on November 2, 2008. (*Id.* ¶ 22.) Marya claims he traveled to New York to meet with executives at the Famous Famiglia Pizza Corp. on November 3, 2008, at the request of Bhatara, although he had "no interest in a relationship" with Famous Famiglia. (*Id.*)

On November 1, 2008, Eugenie Wilson, an assistant manager at Franchise India e-mailed Bhatara to inform him that Deepika Handa, a legal advisor at Franchise India, would be e-mailing him a draft "Commercial Agreement," which Handa did e-mail to Bhatara later that same day. (*Id.* ¶ 23 & Ex. C.) Wilson also wrote in her e-mail to Bhatara that Marya "requests you to please carry a copy of the Agreement when you meet with him on the 2nd Nov [sic] for dinner." (*Id.*)[3]

Bhatara and Marya met for dinner on November 2, 2008, at the BLT Steakhouse in White Plains, New York. (Bhatara Dec.

---

[3] Marya maintains that "[a]ll terms of the 'Draft' were discussed with Bhatara while he was in India." (Marya Dec. ¶ 30.) The court, however, does not find Marya's assertion to be accurate for purposes of this motion because (i) the court must give deference to Bhatara's assertions, and (ii) Bhatara's assertion is corroborated by the e-mails from Marya's employees at Franchise India asking Bhatara to take a copy of the draft Commercial Agreement to dinner.

¶ 27.)  Bhatara states that he brought a copy of the draft

Commercial Agreement to dinner and "discussed its terms in

detail" with Marya.  (*Id.* ¶ 28.)  At the end of the dinner,

Bhatara stated that he and Marya "reached a resolution that

while there were still a great deal of outstanding ministerial

terms to finalize, the core of our agreement should move

forward."  (*Id.*)

        Specifically, Bhatara claims that he and Marya

confirmed that they would each own 50 percent of the joint

venture in India, that Marya's interest would be established by

actively operating the joint venture in India, and that

Bhatara's interest would be secured by his existing equity in

the License, for which he paid the full purchase price of

$400,000, in addition to compensation from Marya in

consideration for placing the ownership of the License in the

joint venture.  (*Id.*)  Bhatara also claims that he and Marya

resolved to "proceed by way of an agreement in principle until

all remaining terms were resolved" because they were scheduled

to fly to Illinois to meet with Francorp on November 4, 2008.

(*Id.* ¶¶ 29, 31.)

### C. Terms in the Draft Commercial Agreement

        Several terms in the draft Commercial Agreement are

relevant to this motion.  First, the Agreement stated that Marya

and USHA, represented by is managing partner Bhatara, were the

parties to the Agreement. (Marya Dec., Ex. C, p. 1.) Second, the agreement states that it "sets out the broad mutual understanding between the parties and reflects only the terms that are presently proposed by the parties concerned in order to set up standards and solutions for setting up and formation" of a joint venture in India. (*Id.*) Third, the agreement states that "the terms of this Agreement will arise and be executed only when all material rights, obligations, terms & conditions have been mutually agreed to and set forth in a 'Definitive Agreement' including the Shareholder's Agreement, License Agreement and such other Agreements as the parties may mutually agree to execute from time to time." (*Id.* at p. 2.)

Fourth, Article 10 of the draft Commercial Agreement called for arbitration in New Delhi, India, and Article 14 stated that "[t]his Agreement shall be governed by and construed in accordance with the laws of India." (*Id.* at pp. 11-13.) Bhatara claims that "the nature and location of conflict resolution was amongst the final minor outstanding points of negotiation." (Bhatara Dec. ¶ 80.)

The Commercial Agreement also deviated in certain respects from a term sheet that Bhatara and Marya previously negotiated in late September 2008. (*Id.* ¶¶ 78-79 & Exs. K-L.) Specifically, a legal advisor to Bhatara e-mailed him in September 2008 to ask "whether the arbitration *in USA* will be

binding on the parties located in India." (*Id.*, Ex. L (emphasis added).)  On November 4, 2008, Bhatara's legal advisor e-mailed him again to note that the draft Commercial Agreement provided for arbitration to be conducted under the Arbitration and Conciliation Act, 1996, or pursuant to the laws of India, rather than the "Federal Arbitration Act of the USA" provided in the Term Sheet.  (*Id.*, Ex. K.)

### D. Meeting with Francorp and License Agreement

On November 4, 2008, Bhatara and Marya met with Boroian at Francorp's offices in Olympia Fields, Illinois.  (*Id.* ¶ 31.)  Bhatara and Marya told Boroian that they had reached an agreement in principle concerning their joint venture and wanted to proceed with their plan to use the License in India.  (*Id.*) On November 5, 2008, the License was placed in the name of FAPL pursuant to a License Agreement for the License between Francorp and FAPL.  (*Id.* ¶ 32; Marya Dec., Ex. D.)  Although the License Agreement states that the Licensee, FAPL, has paid the Licensor, Francorp, $400,000 as consideration for the License, (Marya Dec., Ex. D at p. 11), the License Agreement further provides that this fee "shall be paid by Licensee as follows" and states that Francorp "acknowledges receipt of a nonrefundable payment in the amount of FOUR HUNDRED THOUSAND UNITED STATES DOLLARS ($400,000.00 U.S.D.) from Mr. Atul Bhatara."  (*Id.*)

Boroian signed the agreement for Francorp, and Marya signed the agreement for FAPL. (*Id.*) According to Exhibit 1 of the License Agreement, Marya and Bhatara stated that they each owned 50 percent of the shares FAPL, and Marya and Bhatara both signed a statement acknowledging they consented and submitted to Illinois courts and the federal district court located in or serving Cook County, Illinois for any suits concerning the License Agreement. (*Id.*)

Marya and Bhatara then returned to Queens, New York, and had a dinner at the Ramada Plaza near JFK Airport to celebrate and discuss their business relationship. (Bhatara Dec. ¶ 33.) At this dinner, Marya told Bhatara that they would finalize any outstanding items concerning their agreement in the coming weeks. (*Id.* ¶ 34.)

### E. Additional Interactions Between Marya and Bhatara

After returning to India, Marya sent an e-mail to Bhatara on November 8, 2008, stating "I am very excited about our new business partnership and am sure this new joint venture will be very fruitful and beneficial to our organizations." (*Id.* ¶ 35 & Ex. C.) On November 14, 2008, Marya e-mailed Bhatara and asked him to sign and return a consent letter that would appoint Bhatara a director of FAPL. (*Id.* ¶ 37 & Ex. D.) Bhatara signed the letter and returned it to Marya. (*Id.* ¶ 37.)

After November 14, 2008, Bhatara felt Marya became
"increasingly unresponsive" to questions concerning the License.
(*Id.* ¶ 38.)  Bhatara stated that Marya told him he was
reinvesting money derived from the License into FAPL and refused
to further memorialize their agreement.  (*Id.*)

Bhatara and Marya met several times in India after
November 14, 2008.  (Marya Dec. ¶ 39.)  Marya and Bhatara met in
Hyderabad, India around February 2009, in Chandigarh, India
around May 2009, and in New Delhi, India, around June 2009.
(*Id.*)  Marya claims that there had been no meeting of the minds
concerning the draft, that Bhatara did not seek shares in FAPL,
and that Bhatara repeatedly sought to sell the License to Marya.
(*Id.* ¶¶ 38-40.)

On July 11, 2011, Bhatara filed a demand for
arbitration in Illinois.  (*Id.* ¶ 40 & Ex. E.)  But on February
2, 2012, the arbitration was dismissed for lack of jurisdiction
because neither Bhatara nor Marya were parties to the Licensing
Agreement between Francorp and FAPL.  (*Id.* ¶ 43 & Ex. F.)  In
connection with this proposed arbitration proceeding, counsel
for Marya stated that "[a]lthough [Bhatara] was listed as a 50%
owner in FAPL [in the exhibits to the License Agreement],
[Bhatara] never held equity in FAPL.  [Marya] did not object to
[Bhatara] characterizing himself as a 50% owner because, at that
time, FAPL was less than a month old, and [Marya] believed and

expected that [Bhatara] would subsequently fulfill his responsibilities to become a co-owner." (Bhatara Dec., Ex. M, p.4 n.5.)

### III. Service on Marya

On June 6, 2012, Boroian received an e-mail from a lawyer for plaintiffs informing him that plaintiffs were filing suit, and Boroian e-mailed Marya that same day, informing him of the lawsuit and asking him to "communicate with [plaintiffs] and negotiate a resolution before this goes any further." (Bhatara Dec. ¶ 45 & Ex. E.) On June 9, 2012, Marya responded to Boroian's e-mail and told him he would be in the United States the following week. (*Id.* ¶ 46 & Ex. E.)

Franchise India was participating in the International Franchise Expo, which was taking place between June 15 and June 17, 2012, in New York City. (Marya Dec. ¶¶ 61-62.) Boroian saw Marya operating a booth at this exposition. (Boroian Dec. ¶ 31.) Marya claims that he had not planned to attend the International Franchise Expo but decided to leave Las Vegas, where he had originally planned to be during his trip, and go to New York to discuss the License with Marya and Boroian. (Marya Dec. ¶¶ 64-65.)

Bhatara e-mailed Marya and Boroian on June 11, 2012 to suggest a meeting to resolve the dispute concerning the License. (Marya Dec. ¶ 65.) At approximately 7:00 p.m. on June 16, 2012,

Marya arrived at a Hilton Hotel located on the Avenue of the
Americas in New York City. (*Id.* ¶ 67, Bhatara Dec. ¶¶ 50-51.)
Marya claims he was immediately served with a Summons and
Complaint after arriving, and no settlement meeting took place.
(Marya Dec. ¶ 67.) But Bhatara and Bhatara's cousin, Vishal
Sharma, claim they had a lengthy meeting with Marya, and that,
at the conclusion of the meeting, Marya was served with multiple
copies of the Summons and Complaint, both personally and on
behalf of Franchise India and FAPL. (Bhatara Dec. ¶ 50;
Declaration of Vishal Sharma, ¶ 3.)

### IV. Famous Famiglia and Franchise India

Marya claims he agreed to meet with executives at
Famous Famiglia Pizza Corp. on November 3, 2008, in White
Plains, New York, at the request of Bhatara, even though he "had
no interest in a relationship" with Famous Famiglia. (Marya
Dec. ¶ 22.) But after Marya met with executives at Famous
Famiglia, Franchise India entered into a business relationship
with Famous Famiglia. (Bhatara Dec. ¶ 57.) Franchise India
designated an employee to serve as Famous Famiglia's project
manager, Franchise India represented Famous Famiglia in trade
shows in India, and Franchise India advertised the Famous
Famiglia brand in advertisements in India. (*Id.* ¶ 58 & Ex. F.)

## I.   Service of Process

Defendants first argue that this case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process, arguing that plaintiffs used fraud or deceit to lure defendants into this jurisdiction. (Memorandum of Law in Support of Motion to Dismiss ("Mem."), 10/11/12, at 10.)  This argument is meritless.

### A. Legal Standard

"[W]hen a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service."[4] *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010) (quoting *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005) (parentheses omitted)).  "[I]n considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. Daimlerchrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

When a case is removed from a state court, the federal district court must look to state law to determine whether service of process was valid. *Marine Midland Bank v. Smith*, No.

---

[4] The court also notes that the Second Circuit has held that "[r]emoval does not waive any Rule 12(b) defenses." *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 n.4 (2d Cir. 1996).

79 Civ. 1612, 1979 U.S. Dist. LEXIS 11753, at *4 (S.D.N.Y. June 13, 1979); *see also DiCesare-Engler Prods., Inc. v. Mainman, Ltd.*, 421 F. Supp. 116, 120 (W.D. Pa. 1976) ("In considering . . . service of process, the federal court must look to the law of the state in which the action was commenced to determine its validity.").

Under New York law, a plaintiff may effect service "by delivering the summons within the state to the person to be served." N.Y.C.P.L.R. § 308(1) (2014). "It has long been held that where a defendant has been lured into this jurisdiction by fraud or deceit in order that he may be served, the service so effected is invalid." *Terlizzi v. Brodie*, 329 N.Y.S.2d 589, 590 (N.Y. App. Div. 1972); *see also Wildeboer v. Tallant*, No. 82 Civ. 4542, 1982 U.S. Dist. LEXIS 16072, at *3-4 (S.D.N.Y. Nov. 10, 1982) ("the use of false pretenses to entice a defendant from beyond the court's territorial jurisdiction to within it is ground for upsetting service"); *Maydanik v. Cieri*, 819 N.Y.S.2d 849, 849 (N.Y. Sup. Ct. 2006) ("service obtained through trickery or deceit will not be countenanced").

But "[i]f the invitation to defendant was a legitimate one and not a pretext, *and the defendant was or should have been aware that there was likelihood of service upon him*, no fraud or deceit was practiced upon the defendant and the service should not be set aside." *Allen v. Betterly*, 16 N.Y.S.2d 318, 319

(N.Y. App. Div. 1939) (emphasis added); *see also Marine Midland Bank*, 1979 U.S. Dist. LEXIS 11753, at *5-6 (finding service proper where defendant was served after meeting with plaintiff in part because service "should not have come as a surprise to [defendant]" due to defendant's awareness of potential lawsuit); *Waljohn Waterstop, Inc. v. Webster*, 232 N.Y.S.2d 665, 666-67 (N.Y. Sup. Ct. 1962) (finding no fraud or deceit where defendant was served with summons after coming to New York for meeting with plaintiff partly because "defendant had been told that the plaintiff would sue him if an agreement could not be reached").

Finally, if a defendant is already in the state, a substantial latitude to use trickery is permitted. *See Gumperz v. Hofmann,* 283 N.Y.S. 823, 825 (N.Y. App. Div. 1935) ("We think that legal as well as practical considerations preponderate in favor of the rule that service is not to be invalidated merely because secured by a deception practiced on the defendant, which, in no true sense, was injurious to him. It may fairly be said that there is a duty upon persons within the jurisdiction to submit to the service of process."), *aff'd*, 2 N.E.2d 687 (N.Y. 1936); *see also Schwarz v. Artcraft Silk Hosiery Mills, Inc.*, 110 F.2d 465, 466 (2d Cir. 1940) ("It is now settled in New York that misstatements which mislead a defendant and induce him to appear where service may be, and is, made upon him which otherwise would not have then been made afford no ground for

vacating the service *provided the trick does not lure the person served into the jurisdiction*.") (emphasis added); *American-European Art Assocs. v. Moquay*, No. 93 CIV 6793, 1995 U.S. Dist. LEXIS 7113, at *10-11 (S.D.N.Y. May 23, 1995) (same).

### B. Application

Defendants argue that they were not properly served because plaintiffs allegedly used fraud or deceit to lure Marya to New York. (Mem. at 10.) Plaintiffs deny that they used any fraud or deceit to lure Marya to New York and further assert that Marya intended to travel to New York on business unrelated to his meeting with Bhatara. (Opposition to Motion to Dismiss ("Opp."), 11/7/12, at 16-17.)

As a preliminary matter, Marya does not and cannot dispute that he was aware or should have been aware that there was a likelihood he would be served in connection with this lawsuit if he travelled to New York. Boroian forwarded Marya news of the plaintiffs' lawsuit in an e-mail on June 6, 2012 and urged Marya to "communicate with [plaintiffs] and negotiate a resolution before this goes any further." (Bhatara Dec., Ex. E.) Marya responded to Boroian's e-mail on June 9, 2012, claiming that "Francorp India and I have not defaulted to [sic] any commitments and agreements." (*Id.*) These e-mails show that Marya was informed about and knew of plaintiffs' pending lawsuit

against him, Franchise India, and FAPL well before he met with Bhatara on June 16, 2012.

Nevertheless, Marya alleges that service was improper because he was lured into New York through fraud and deceit. Marya claims that he only travelled to New York after receiving an e-mail from Bhatara on June 11, 2012, suggesting a meeting. (Marya Dec. ¶¶ 64-65.)  Marya also claims that when he arrived for the scheduled meeting with Bhatara at the Hilton Hotel on Avenue of the Americas in New York at 7:00 p.m. on June 16, 2012, he was immediately served with a Summons and Complaint, and no meeting actually took place.  (Marya Dec. ¶ 67.)

Bhatara and his cousin, Vishal Sharma, however, have both submitted declarations alleging that they did in fact have a lengthy meeting with Marya at the hotel before he was served on June 16, 2012.  (Bhatara Dec. ¶ 50; Declaration of Vishal Sharma, ¶ 3 (noting meeting "lasted approximately an hour.") Bhatara and Sharma are not unbiased declarants, but their accounts of the meeting are corroborated by the affidavits of the process server, Michael Gitlitz.  Gitlitz averred that he served Marya at 8:30 p.m. on June 16, 2012, at the Hilton Hotel on Avenue of the Americas in New York City.  (Affidavits of Michael Gitlitz, 6/26/12.)  Marya has conceded that he arrived at the hotel at 7:00 p.m., (Marya Dec. ¶ 67), and the time of service in Gitlitz's affidavits – 8:30 p.m. – is consistent with

the declarations by Bhatara and Bhatara's cousin Sharma that they met at some length with Marya at the hotel before Marya was served, (Bhatara Dec. ¶ 50; Declaration of Vishal Sharma, ¶ 3).[5] Accordingly, the court finds that Marya did in fact arrive at the Hilton Hotel at 7:00 p.m., met with Bhatara and Sharma for over an hour to discuss a settlement, and was properly served at 8:30 p.m., both in his individual capacity and on behalf of Franchise India and FAPL. Because "the invitation to defendant was a legitimate one and not a pretext, and the defendant was or should have been aware that there was likelihood of service upon him, no fraud or deceit was practiced upon the defendant and the service should not be set aside." *Betterly*, 16 N.Y.S.2d at 319.

Even if Marya had somehow been tricked into going to the Hilton Hotel, service upon Marya, Franchise India, and FAPL would still be proper. The evidence shows that Marya intended to travel to New York for the International Franchise Expo before he was invited by Bhatara to a settlement meeting at the Hilton, and was thus not lured to the state by Bhatara.

Marya claims that he only left Las Vegas, Nevada, and travelled to New York after Bhatara e-mailed him and Boroian on June 11, 2012, to suggest a meeting and that he had not previously planned to attend the International Franchise Expo in New York. (Marya Dec. ¶¶ 64-65.) Marya has not provided any

---

[5] Marya has not proffered any evidence to refute the time of service in Gitlitz's affidavits of service.

explanation of what he was doing in Las Vegas or produced any evidence, such as e-mails, bills, travel documents, or other documents that would verify that he was actually in, or planned to travel to and remain in Las Vegas, and only changed his plans to travel to New York after receiving Bhatara's e-mail on June 11, 2012.

The evidence in the record contradicts Marya's assertions. Boroian e-mailed Marya on *June 10*, 2012, and referred in that e-mail to Marya's presence "*in New York next week*." (Bhatara Dec., Ex. E (emphasis added).) This e-mail shows that Boroian knew that Marya was already planning to travel to New York by June 10, 2012, a day *before* Bhatara had e-mailed Marya about a meeting in New York on June 11, 2912. (Marya Dec. ¶ 65.) Boroian also averred that "Marya was able to coordinate [his meeting with Bhatara] with related business involving his affiliate entity [Franchise India]," and that Marya operated a booth at the International Franchise Expo in New York City. (Boroian Dec. ¶¶ 29-31.)

Consequently, the court finds that Marya intended to travel to New York to participate in the International Franchise Expo before Bhatara e-mailed him on June 11, 2012, to suggest a meeting and that Marya did in fact participate in the International Franchise Expo. As a result, even if Bhatara had tricked Marya into meeting him at the Hilton after Marya was

already in New York, service would still be proper because Marya was "not lure[d] . . . into the jurisdiction," *Schwarz*, 110 F.2d at 466, and he had "a duty [as a person] within the jurisdiction to submit to the service of process," *Gumperz,* 283 N.Y.S. at 825.[6]

## II.   Personal Jurisdiction

In a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). But where "the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).  Although the court "will not draw 'argumentative inferences' in the plaintiff's favor," the court must "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).

---

[6] Because defendants do not dispute that Marya, as an officer of Franchise India and FAPL, could accept service on behalf of those two companies, the court finds that Franchise India and FAPL were both properly served by personal service on Marya pursuant to CPLR § 311(a)(1).  N.Y.C.P.L.R. § 311(a).

"A court sitting in diversity applies the law of the
forum state in determining whether it has personal jurisdiction
over the defendants." *Agency Rent A Car Sys. v. Grand Rent A
Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also D.H. Blair &
Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (same). If
personal jurisdiction is established pursuant to the state's
long-arm statute, the court must then assess whether assertion
of jurisdiction comports with constitutional due process. *See
Metro. Life Ins. V. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d
Cir. 1996); *D.H. Blair & Co.*, 462 F.3d at 104.

In this case, plaintiffs have asserted jurisdiction
under New York Civil Practice Law and Rules ("CPLR") sections
301 and 302. Plaintiffs argue this court has personal
jurisdiction over defendants under three theories: transient
jurisdiction, general jurisdiction, and specific jurisdiction.
Each of these arguments will be considered in turn.

## A. Jurisdiction under CPLR § 301

### 1. Transient Jurisdiction over Marya

"Among the most firmly established principles of
personal jurisdiction in American tradition is that the courts
of a State have jurisdiction over nonresidents who are
physically present in the State. The view developed early that
each State had the power to hale before its courts any
individual who could be found within its borders, and that once

having acquired jurisdiction over such a person by properly serving him with process, the State could retain jurisdiction to enter judgment against him, no matter how fleeting his visit." *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 610-611 (1990). It has been a "longstanding principle that service of process on a defendant within a jurisdiction, no matter how briefly, is sufficient to confer personal jurisdiction and that due process is not offended." *American-European Art Assocs.*, 1995 U.S. Dist. LEXIS 7113, at *7; *see also Opert v. Schmid*, 535 F. Supp. 591, 593 (S.D.N.Y 1982) (court had personal jurisdiction over defendant who was served while in New York to attend U.S. Grand Prix event).

Under New York law, courts have personal jurisdiction pursuant to CPLR § 301 over individual defendants who have been properly served. *E.g.*, *In re Le*, 637 N.Y.S.2d 614, 616 (N.Y. Sup. Ct. 1995) ("the notion of transient jurisdiction has been codified in CPLR 301, which provides that '[a] court may exercise jurisdiction over persons, property, or status as might have been exercised heretofore'") (quoting N.Y.C.P.L.R. § 301); *see also Rawstorne v. Maguire*, 192 N.E. 294, 295-96 (N.Y. 1934) ("Where there is 'bodily presence' within the boundaries of the State there is opportunity for the exercise of the State's sovereignty, even though bodily presence is not accompanied by any intention to remain there permanently."). As explained in

Discussion section I.B., this court has found that Marya, Franchise India, and FAPL were properly served in New York. Therefore, this court finds that plaintiffs have established jurisdiction over Marya under CPLR § 301 because he was properly served in the state.

### 2. General Jurisdiction over Franchise India and FAPL

As a preliminary matter, plaintiffs' argument that they "have unequivocally obtained jurisdiction over the Defendants, through this Court, due to the actual service of process upon the Defendants within New York State," (Opp. at 16), is incorrect as a matter of law. "The predicate for this State's jurisdiction [under CPLR § 301] over an *unauthorized* foreign corporation is the fact that it is doing business in the State and has thus created a constructive presence over which New York courts can exert general jurisdiction." *Flick v. Stewart-Warner Corp.*, 555 N.E.2d 907, 909 (N.Y. 1990) (emphasis in original). Even if an individual who can accept service on behalf of a corporation has been properly served, as Marya was in this case, the court must still determine whether foreign corporate defendants such as Franchise India and FAPL have been "doing business" in New York so that they could be considered present in the state and subject to general jurisdiction under CPLR § 301. *Id.; see also Frummer v. Hilton Hotels Int'l, Inc.*,

227 N.E.2d 851, 853 (N.Y. 1967) (same); *Capello v. Union Carbide & Carbon Corp.*, 95 N.Y.S.2d 36, 38 (N.Y. App. Div. 1950) (stating that "the test of the validity of the service of summons upon a foreign corporation, within the State, is whether or not the foreign corporation is doing business in the State" and that "the court acquires no jurisdiction" if the corporation is not doing business in the state).

"A foreign corporation is amenable to suit in New York courts under CPLR 301 if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 565 N.E.2d 488, 490 (N.Y. 1990). "The test for doing business is a simple [and] pragmatic one, which varies in its application depending on the particular facts of each case. The court must be able to say from the facts that the corporation is present in the State not occasionally or casually, but with a fair measure of permanence and continuity." *Id.* (internal quotations and citations omitted) (alteration in original); *see also Parsons v. Kal Kan Food, Inc.*, 892 N.Y.S.2d 246, 247 (N.Y. Sup. Ct. 2009) (CPLR § 301 "permits New York courts to exercise jurisdiction over an entity that has engaged in a continuous and systematic course of doing business in this state, such that it may be said

to have a presence here") (internal quotation and citation omitted.

        "In assessing jurisdiction under this pragmatic standard, New York courts have generally focused on the following indicia of jurisdiction: the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York." *Landoil*, 918 F.2d at 1043. "However, the 'solicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services.'" *Id.* (quoting *Laufer v. Ostrow*, 434 N.E.2d 692, 694 (N.Y. 1982)).

        "On the other hand, if the solicitation is substantial and continuous, and defendant engages in other activities of substance in the state, then personal jurisdiction may properly be found to exist." *Id.; see also Schultz v. Safra Nat'l Bank*, 377 F. App'x 101, 102-03 (2d Cir. 2010) (summary order) ("Solicitation alone will not ordinarily show that a defendant is doing business in New York, but where combined with evidence that the defendant engages in other activities of substance in the state, then personal jurisdiction may properly be found to exist.") (internal quotation and citation omitted). "Under this 'solicitation-plus' rule, 'once solicitation is found in any *substantial* degree very little more is necessary to a conclusion

of 'doing business.'" *Landoil*, 918 F.2d at 1044 (quoting *Aquascutum of London, Inc. v. S.S. Am. Champion*, 426 F.2d 205, 211 (2d Cir. 1970)) (emphasis added). Still, "[t]o sustain personal jurisdiction, New York courts 'require substantial solicitation that is carried on with a considerable measure of continuity and from a permanent locale within the state.'" *Beacon Enter., Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir. 1983) (quoting *Stark Carpet Corp. v. M-Geough Robinson, Inc.*, 481 F. Supp. 499, 505 (S.D.N.Y. 1980)); *see also Bryant v. Finnish Nat'l Airline*, 208 N.E.2d 439, 440 (N.Y. 1965) (same); *Ring Sales Co. v. Wakefield Eng'g, Inc.*, 454 N.Y.S.2d 745, 746 (N.Y. App. Div. 1982) (holding that plaintiff must show that defendant "solicits business . . . in a sufficiently systematic and continuous manner" to establish jurisdiction under CPLR § 301).

Finally, the court is mindful that "[c]ontacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole." *Metro. Life Ins. Co.*, 84 F.3d at 570.

At the outset, the court notes there is no evidence that Franchise India and FAPL have offices, bank accounts or other property in New York, or any employees or agents in New York. In fact, all the evidence in the record shows that

Franchise India and FAPL are based in India and primarily derive
their revenue from operations outside New York. (Marya Dec. ¶¶
44-47, 49-50, 70.)

Nevertheless, plaintiffs argue that various contacts
between Marya, Franchise India, and New York, when viewed as
whole, demonstrate that Franchise India has "engaged in such
extensive activities within New York, that it must be subject to
the general jurisdiction of New York's courts." (Opp. at 20.)
Plaintiffs also assert that Franchise India and FAPL "appear to
be inseparable" and that jurisdiction is thus appropriate over
FAPL as well. (*Id.* at 21.)

Plaintiffs first point to various trips made by Marya
to New York to solicit business. Plaintiffs allege that Marya
travelled to New York in November 2008 to meet with executives
of Famous Famiglia Pizza and Bhatara about the License and that
he travelled to New York again in June 2012 to participate in
the International Franchise Expo, during the course of which he
met with Bhatara again. (Bhatara Dec. ¶¶ 27-28.) Plaintiffs
also allege that Marya or another representative of Franchise
India may have been to New York at least one additional time in
connection with its business dealings with Famous Famiglia, but
they concede that "it is presently unknown how often the
Defendants actually enter this jurisdiction in connection with
business." (Opp. at 21 (citing Bhatara Dec., Ex. F).) These

random and sporadic solicitations on behalf of Franchise India,

which amount to three trips over the course over four years

based on the record before the court, considered on their own or

in the aggregate, would be "insufficient to establish the

*systematic and continuous presence* within the state that New

York law requires." *Landoil*, 918 F.2d at 1045 (emphasis added).

Plaintiffs also argue that Franchise India solicits

business from thousands of companies through its web page and

that it has contractual franchising relationships with iconic

companies that do business in New York, such as the Sesame

Street Preschool program, the Kenny Rogers Roasters franchise,

and Famous Famiglia. (Bhatara Dec. ¶¶ 57-58, 61-63, & Ex. F.)

It is well-established, however, that "[t]he existence of

contractual relationships with entities that happen to have

operations in New York does not establish § 301 jurisdiction,

because it does not show extensive conduct directed toward or

occurring in New York." *Reers v. Deutsche Bahn AG*, 320 F. Supp.

2d 140, 150 (S.D.N.Y. 2004); *see also Nelson v. Mass. Gen.*

*Hosp.*, No. 04-CV-5382, 2007 U.S. Dist. LEXIS 70455, at *64

(S.D.N.Y. Sept. 20, 2007) (same), *aff'd*, 299 F. App'x 78 (2d

Cir. 2008) (summary order); *Mantello v. Hall*, 947 F. Supp. 92,

98 (S.D.N.Y. 1996) ("The mere existence of a business

relationship with entities within the forum state is

insufficient to establish presence.") (quoting *Ins. Co. of Penn. v. Centaur Ins. Co.*, 590 F. Supp. 1187, 1189 (S.D.N.Y. 1984)).

Moreover, "[t]he fact that a foreign corporation has a website accessible in New York is insufficient to confer jurisdiction under CPLR § 301." *Spencer Trask Ventures, Inc. v. Archos S.A.*, No. 01 Civ. 1169, 2002 U.S. Dist. LEXIS 4396, at *22 (S.D.N.Y. Mar. 18, 2002); *see also Nelson*, 2007 U.S. Dist. LEXIS 70455, at *65 (same); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, No. 03 Civ. 1681, 2004 U.S. Dist. LEXIS 19614, at *24 (S.D.N.Y. Sept. 29, 2004) ("courts have routinely held that the fact that a foreign corporation has an interactive website accessible to New York, without more, is insufficient to confer jurisdiction under CPLR § 301").

In this case, representatives of Franchise India and FAPL, which are based in India and primarily derive their revenues from operations outside New York, purportedly made three trips to the state to negotiate contracts for franchising opportunities outside New York and used a website to advertise franchising opportunities outside New York. (Marya Dec. ¶¶ 44-47, 49-50, 70; Bhatara Dec. ¶¶ 61-63.) "Through these activities, defendants, in essence, merely [were] secur[ing] the . . . services they need[ed] . . . [for] their business," such as creating new franchises *outside* New York. *Mantello*, 947 F. Supp. at 98. But Franchise India and FAPL were not "doing

business" on a consistent and ongoing basis *within* New York as required for jurisdiction under CPLR § 301. *Id.; cf. Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 916 F. Supp. 224, 228 (S.D.N.Y.) ("The purchase of goods from New York by a Defendant, even if on a large scale, would not, in and of itself, amount to 'doing business' *within the state*.") (emphasis added), *rev'd on other grounds*, 98 F.3d 25 (2d Cir. 1996). Therefore, the court finds that plaintiffs have failed to establish that this court has general jurisdiction over Franchise India and FAPL under CPLR § 301.[7]

## B. Jurisdiction under CPLR § 302

This court's exercise of specific jurisdiction over Franchise India and FAPL under CPLR § 302 depends on two issues: whether Marya was acting on behalf of those companies when he met with Bhatara in New York to negotiate a contract, and whether Bhatara has made a *prima facie* case that he and Marya, who was allegedly acting on behalf of Franchise India and FAPL, in fact entered into an agreement during their meeting in New York. The court will discuss these issues below.

---

[7] Plaintiffs rely on *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010), to argue that this court has "general jurisdiction" but misinterpret the case. (Opp. at 22.) The Second Circuit's opinion in *Chloe* only concerned whether the district court had *specific* jurisdiction over a defendant as asserted by plaintiffs in that case, not *general* jurisdiction as plaintiffs erroneously claim. *Chloe*, 616 F.3d at 164 ("Chloe asserts only specific jurisdiction over Ubaldelli.").

## 1. Relationship between Marya, Franchise India, and FAPL

Plaintiffs appear to assert that alter-ego or veil-piercing theories warrant a finding of personal jurisdiction, arguing that "there can be no dispute that Marya, Franchise India, and [FAPL] are indistinguishable, as they appear to jointly conduct business . . . and both [FAPL] and Franchise India are controlled by Marya." (Opp. at 19.) To that end, plaintiffs argue that Marya controls Franchise India and FAPL and that they are "agents of one another." (*Id.*) Defendants, however, aver that, while Marya "is an owner of both entities, he is not the sole owner, and different persons own both entities." (Reply, 3/4/13, at 10.) They also point out that the draft Commercial Agreement does not mention Franchise India. (*Id.*)

"On an alter-ego claim for liability, the corporate veil will be pierced if a plaintiff can demonstrate that 'the alleged dominating party exercised complete domination over the corporation with respect to the subject transaction and that such domination was used to commit a fraud or other wrong which injured [the] plaintiff.'" *Cardell Fin. Corp. v. Suchodolski Assocs.*, No. 09 Civ. 6148, 2012 U.S. Dist. LEXIS 188295, at *47-48 (S.D.N.Y.) (quoting *Miramax Film Corp. v. Abraham*, No. 01 CV 5202, 2003 U.S. Dist. LEXIS 21346, at *18 (S.D.N.Y. Nov. 25,

2003)), *adopted by* 896 F. Supp. 2d 320 (S.D.N.Y. 2012). "The standard for piercing the corporate veil for purposes of personal jurisdiction, however, is 'a less stringent one.'" *Id.* (quoting *Miramax*, 2003 U.S. Dist. LEXIS 21346 at *20). "If a corporation is merely a shell, the corporate veil may be pierced to impute jurisdiction even without a showing that the shell was used to perpetrate a fraud." *Miramax*, 2003 U.S. Dist. LEXIS 21346 at *20-21.

"The critical inquiry is determining whether a corporation is a 'shell' company is whether it is being used by the alleged dominating entity to advance its own personal interests as oppose[d] to furthering the corporate ends." *Id.* at *21 (collecting cases). To determine if a corporation is being used as a shell, courts examine factors such as the failure to observe corporate formalities, inadequate capitalization, intermingling of personal and corporate funds, shared office space and phone numbers, or an overlap of ownership, directors, officers, and personnel. *Id.* at *22.

Marya is the principal and managing director of Franchise India and the managing director of FAPL, all of the shareholders of Franchise India are relatives of Marya, and Marya asserts that he and his brother own the shares of FAPL. (Marya Dec. ¶¶ 1, 45, 49.) Yet because Defendants have asserted, and plaintiffs have not disputed, that Franchise India

34

and FAPL were incorporated separately, are run separately, respect corporate formalities, and file separate tax returns in India, (Reply at 10), the court finds that plaintiffs have failed to establish a *prima facie* case that Franchise India and FAPL are alter egos of Marya or the same entity because there is no evidence or factual assertion that Marya dominates either entity "to advance [his] own personal interests as oppose[d] to furthering the corporate ends." *Miramax*, 2003 U.S. Dist. LEXIS 21346 at *21.

Nevertheless, the evidence in the record establishes a *prima facie* case that Franchise India and FAPL are liable for the actions undertaken by Marya because Marya was acting with actual authority as their agent when negotiating with Bhatara. Under New York law, a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.C.P.L.R. § 302(a)(1) (2014). "To bind a principal to a contract, a putative agent must be vested with actual or apparent authority." *Hudson & Broad, Inc. v. J.C. Penney Corp.*, No. 12 Civ. 3239, 2013 U.S. Dist. LEXIS 89207 (S.D.N.Y. June 18, 2013), at *11 (quoting *BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*, No. 06-cv-839, 2006 U.S. Dist. LEXIS 54588, at

*9 (S.D.N.Y. Aug. 8, 2006)), *aff'd*, No. 13-2720-cv, 2014 U.S. App. LEXIS 1675 (2d Cir. Jan. 28, 2014).

"[A]ctual authority is created by direct manifestations from the principal to the agent." *Aleph Towers, LLC v. Ambit Tex., LLC*, No. 12-CV-3488, 2013 U.S. Dist. LEXIS 120284, at *19 n.10 (E.D.N.Y. Aug. 23, 2013) (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)). "[A]n agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." *Hudson & Broad, Inc.*, 2013 U.S. Dist. LEXIS 89207 at *11-12 (quoting *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010)).

Because Marya has admitted that he is the principal and managing director of Franchise India, the managing director and owner of 50 percent of the shares of FAPL, and in fact signed the License Agreement with Francorp on behalf of FAPL, he does not and cannot plausibly argue that he lacked actual authority to enter into contracts on behalf of either Franchise India or FAPL. (Marya Dec. ¶¶ 1, 45, 49, Ex. D.) In this case, Bhatara has asserted that he reached an agreement with Marya during a dinner in White Plains, New York on November 2, 2008. (Bhatara Dec. ¶¶ 27-28.) Although the draft agreement that Bhatara brought to the meeting with Marya does not mention

36

Franchise India, (Marya Dec., Ex. C), Bhatara has attested that
he understood the agreement plaintiffs entered into on November
2, 2008 was with, and would benefit, Marya, Franchise India, *and*
FAPL, (Bhatara Dec. ¶¶ 6, 27-28).

Bhatara's claim is consistent with evidence in the
record. First, in his e-mail discussions with Bhatara, Marya
described the proposed joint venture as a "win-win for both
companies" and anticipated "market[ing]" the Francorp license
"aggressively" through Franchise India. (Bhatara Dec., Ex. I.)
Second, a legal advisor at Franchise India e-mailed the draft
Commercial Agreement to Bhatara for review before the meeting.
(Marya Dec. ¶ 23 & Ex. C.) Finally, Marya, who regularly e-
mailed Bhatara from his Franchise India e-mail address in
connection with discussions about the proposed agreement, stated
in an e-mail after the meeting that "this new joint venture will
be very fruitful and beneficial to our *organizations*." (Bhatara
Dec. ¶ 35 & Ex. C (emphasis added).) After giving appropriate
deference to Bhatara's affidavit at this stage of the
proceedings and considering the evidence in the record, the
court finds that plaintiffs have established a *prima facie* case
that Marya, who was the principal and managing director of
Franchise India, negotiated a contract with Bhatara as an agent
of Franchise India and on behalf of Franchise India. The court
also finds that the evidence establishes a *prima facie* case that

37

Marya entered into an agreement with Bhatara on behalf of FAPL because the draft Commercial Agreement specifically calls for the License to be deposited in FAPL and for Marya to take steps to generate revenues for FAPL. (Marya Dec., Ex. C.)[8]

"Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Aleph Towns LLC*, 2013 U.S. Dist. LEXIS 120284, at *19 (quoting *Peltz*, 115 F.3d at 1088). "Apparent authority will only be found where words or conduct of the principal — not the agent — are communicated to a third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue." *Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*, 867 N.Y.S.2d 547, 549 (N.Y. App. Div. 2008). Although the court has already found that Marya had the actual authority to act on behalf of Franchise India and FAPL, the court also finds that Bhatara would have been reasonably induced to believe that Marya was authorized to act on behalf of Franchise India and FAPL by virtue of the positions Marya purports to have held at both companies, and because a legal advisor at Franchise India e-

---

[8] As stated, FAPL was incorporated in India on October 7, 2008, after the August and September negotiations between Marya and Bhatara, and about a month before Marya's meetings in New York with Bhatara and in Illinois with Bhatara and Francorp. (Marya Dec. ¶ 19.)

mailed Bhatara a copy of the draft Commercial Agreement, and another employee at Franchise India instructed him to take a copy of the agreement to his meeting with Marya. (Marya Dec. ¶¶ 23-24 & Ex. C.)[9] Accordingly, the court finds that Marya acted with actual and apparent authority on behalf of Franchise India and FAPL.

### 2. Specific Jurisdiction over Marya, FAPL, and Franchise India

Plaintiffs argue that specific jurisdiction is appropriate pursuant to CPLR § 302. (Opp. at 17-19.) Under CPLR § 302(a)(1), a New York court may exercise personal jurisdiction over a non-domiciliary "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.C.P.L.R. § 302(a)(1). In order to evaluate if the statute is satisfied, the court analyzes whether the defendant "transacts any business" in New York and, if so, whether the cause of action "aris[es] from" such a business transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850

---

[9] Although Marya appears to be acting in his individual capacity as well as an agent of Franchise India and FAPL, the court also notes that, even if Marya had only been acting as an agent of Franchise India and FAPL, he could be sued in New York because the Court of Appeals has rejected the fiduciary shield doctrine, which provides that an individual should not be subject to jurisdiction if his dealings in the forum state were solely in a corporate capacity. *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 46 (N.Y. 1988) ("we determine that it is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York").

N.E.2d 1140, 1142 (N.Y. 2006)). For purposes of CPLR §

302(a)(1)'s "transaction of business" test, the New York Court

of Appeals has held that "[t]he overriding criterion necessary

to establish a transaction of business is some act by which the

defendant purposefully avails itself of the privilege of

conducting activities within [New York]." *Ehrenfeld v. Bin*

*Mahfouz*, 881 N.E.2d 830, 834 (N.Y. 2007) (internal quotation and

citation omitted) (alteration in original).

To determine whether a party in a breach of contract

case has "transacted business" within the meaning of CPLR §

302(a)(1), the Second Circuit has explained that courts should

examine four criteria:

    i.      whether the defendant has an on-going contractual relationship with a New York corporation;

    ii.     whether the contract with a New York corporation was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship;

    iii.    what the choice-of-law clause is in any such contract; and

    iv.    whether the contract requires [defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22
                    (2d Cir. 2004) (quoting *Agency Rent A Car*, 98
                    F.3d at 29).

          "Although all factors are relevant, no one factor is

dispositive and other factors may be considered.  *Id.* at 23.

"The ultimate determination is based on the totality of the

circumstances."  *Id.*  (quotation and citation omitted).

          According to New York law, a defendant's physical

presence in the state at the time of the negotiation, making, or

execution of a contract generally justifies a finding of

purposeful availment and allows a court to exercise personal

jurisdiction under CPLR § 302(a)(1) in a breach of contract case

such as this one.  *See George Reiner & Co. v. Schwartz*, 363

N.E.2d 551, 554 (1977) (finding jurisdiction on the basis that

defendant "was physically present in New York at the time the

contract . . . was negotiated and made and the contract . . .

was the transaction out of which the cause of action arose");

*see also Chang v. Gordon*, No. 96 Civ. 0152, 1997 U.S. Dist.

LEXIS 13570, at *14 (S.D.N.Y. Sept. 8, 1997) (a meeting in New

York where parties agreed to exchange stock "is a sufficient

contact to satisfy Plaintiffs' prima facie showing of

jurisdiction"); *Panaria Int'l, Inc. v. Hwan Chang* Choi, No. 88

Civ. 8313, 1989 U.S. Dist. LEXIS 4398, at *3, *5 (S.D.N.Y. Apr.

17, 1989) (holding that plaintiff's averment that he agreed,

during a meeting in New York, to let defendant use his letter of

                                    41

credit to buy goods from another company "easily makes out a prima facie claim" for jurisdiction under CPLR § 302); *Hi Fashion Wigs, Inc. v. Hammond Adver., Inc.*, 300 N.E.2d 421, 423 (N.Y. 1973) (holding that a third-party defendant's voluntary presence in the forum in order to deliver a guarantee was "[s]o essential . . . to its validity and existence as a contract" that the defendant could be deemed to have purposefully availed himself of the forum); *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508 (N.Y. 1970) (observing that "where a defendant was physically present at the time the contract was made" presents "the clearest sort of case in which our courts would have 302 jurisdiction").

As a preliminary matter, the court must determine whether the parties agreed to arbitrate this dispute under the "laws of India." The third factor of the Second Circuit's test "transaction of business" in New York test looks at whether the contract includes a "choice-of-law clause." *See Sunward Elecs., Inc.*, 362 F.3d at 22. Article 14 of the draft Commercial Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of India." (Marya Dec., Ex. C. at p. 13.) But Bhatara claims that "the nature and location of conflict resolution was amongst the final minor outstanding points of negotiation," and notes that the draft Commercial Agreement deviated from a term sheet, which called

for arbitration under the laws of the United States. (Bhatara Dec. ¶¶ 78-80 & Exs. K-L.) Significantly, legal counsel for plaintiffs e-mailed Bhatara on November 4, 2008, to point out that the draft Commercial Agreement called for arbitration pursuant to the laws of India rather than the laws of the United States and reminded Bhatara that he had previously only agreed to arbitration under the laws of the United States in negotiations over the term sheet. (*Id.*, Ex. K.) At this stage of the litigation, "documents are construed in the light most favorable to plaintiff and all doubts are resolved in its favor" and, under that standard, the court finds that the parties had not yet agreed to arbitrate this dispute pursuant to the laws of India. *CutCo Indus., Inc.*, 806 F.2d at 365.

The court next considers the other factors outlined by the Second Circuit in determining whether defendants transacted business in New York and can thus be subjected to specific jurisdiction under CPLR § 302(a)(1). Although Bhatara and Marya initially began their discussions in India and continued negotiations by e-mail, (Marya Dec. ¶¶ 12-18), Bhatara has attested that he and Marya "reached a resolution" on the "core of [their] agreement" at a dinner on November 2, 2008, at the BLT Steakhouse in White Plains, New York, (Bhatara Dec. ¶¶ 27-29). Specifically, Bhatara has stated that he and Marya agreed to each own 50 percent of FAPL, that Marya's interest would be

established by operating FAPL in India, and that Bhatara's
interest would be secured by his existing equity in the License,
and "placing the ownership of the License within [FAPL]" for
their mutual benefit. (*Id.* ¶ 28.) Bhatara would also receive
"additional compensation from Marya." (*Id.*) Marya claims that
the parties did not come to any agreement at this dinner, but he
has provided no evidence to support this claim beyond various
assertions. (Marya Dec. ¶¶ 38-40.)

Bhatara's claim that the parties negotiated a deal
during this dinner in New York, however, is corroborated by the
fact that a legal advisor at Franchise India e-mailed Bhatara a
draft agreement on November 1, 2008, and another colleague of
Marya at Franchise India e-mailed Bhatara that same day and told
him to bring a copy of the draft to his dinner meeting with
Marya. (Marya Dec. ¶ 23 & Ex. C.) On this record, it is not
plausible that Marya's colleagues at Franchise India would e-
mail Bhatara the draft Commercial Agreement and tell him to
bring a copy of the document to a dinner if Marya and Bhatara
did not in fact plan to substantively discuss the draft
Commercial Agreement at the dinner.

Other evidence in the record corroborates Bhatara's
claim that the parties *reached* an agreement during the November
2, 2008 dinner. First, Marya and Bhatara traveled to Illinois
to meet with Boroian and execute the License Agreement, which

was signed on November 5, 2008, by Marya on behalf of FAPL and Boroian on behalf of Francorp. (*Id.* ¶ 35.) The License Agreement specified that Bhatara's payment of $400,000 to Francorp for the License would satisfy FAPL's fee to use the License and identified Marya and Bhatara as each owning 50 percent of the shares of FAPL. (*Id.*, Ex. D at p. 11.) It would make no sense that Bhatara's payment of $400,000 to Francorp would satisfy FAPL's fee to use the License, and for Bhatara to be listed as a 50 percent owner of FAPL, unless Marya and Bhatara had reached an agreement on November 2, 2008, that required Bhatara to pay for the License for FAPL in order to receive 50 percent of the shares in FAPL and profits of FAPL.

Second, Marya wrote in a subsequent e-mail to Bhatara on November 8, 2008, that he was "very excited about our new business partnership and am sure this new joint venture will be very fruitful and beneficial to our *organizations*," which shows that Marya believed he had reached an agreement with Bhatara. (Bhatara Dec. ¶ 35 & Ex. C (emphasis added).) Moreover, on November 14, 2008, Marya e-mailed Bhatara again, asking him to sign and return a consent letter to be appointed a director of FAPL, which Bhatara signed and returned. (Bhatara Dec. ¶ 37 & Ex. C.) It is unlikely that Marya would e-mail Bhatara to trumpet their agreement and take additional steps to follow up

on the agreement if the parties had not in fact reached an
agreement.

Based on appropriate deference to plaintiffs'
assertions and the foregoing evidence, the court finds that
plaintiffs have established a *prima facie* case that, (1) Marya
travelled to New York to negotiate and finalize an agreement
with plaintiffs on behalf of himself, Franchise India, and FAPL,
on November 2, 2008, (2) that defendants entered into an
contractual agreement with plaintiffs on that date that required
defendants to send payments to plaintiffs in New York, (3) that
defendants sent subsequent e-mails in New York confirming the
agreement and requesting that plaintiffs sign and return
additional documents, and (4) that the contractual agreement and
alleged breach of the contractual agreement made in New York
gave rise to this action. *See Saldanha v. Baidyaroy*, No. 91
Civ. 6413, 1992 U.S. Dist. LEXIS 8391, at *13 (S.D.N.Y. June 15,
1992) (finding personal jurisdiction because "[t]he Court
reasonably may infer from plaintiff's affidavit that defendants'
visits to New York were important steps in the contract
formation process between the parties, since plaintiff asserts
that it was during these trips to New York that defendants
requested his services"); *Cross & Cross Props., Ltd. v. Everett
Allied Co.*, 664 F. Supp. 713, 716 (S.D.N.Y. 1987) (personal
jurisdiction established where president of defendant general

partnership "was physically present in New York for negotiation of and agreement in principle to the contracts out of which cause of action arose"). The court further finds that, because "New York courts . . . have adopted a *prospective* analysis in determining whether an ongoing contractual relationship exists," *Aquiline Capital Partners LLC v. Finarch LLC*, 861 F. Supp. 2d 378, 387 (S.D.N.Y. 2012) (emphasis added) (quoting *Schomann Int'l Corp. v. N. Wireless, Ltd.*, 35 F. Supp. 2d 205, 209 (N.D.N.Y. 1999)), and the agreement called for defendants to remit profits to plaintiffs, defendants and plaintiffs necessarily entered into an ongoing business relationship.

Thus, the first, second, and fourth factors of the Second Circuit's test for evaluating whether defendants transacted business in New York and can be subjected to personal jurisdiction under CPLR § 302(a)(1) favor plaintiffs, and the third factor does not apply in this case. *See Sunward Elecs., Inc.*, 362 F.3d at 22. As a result, plaintiffs have established a *prima facie* case that this court has specific jurisdiction over Marya, Franchise India, and FAPL under CPLR § 302(a)(1) because defendants transacted business in New York and this action arose from that transaction of business.

### C. Due Process

A court's assertion of personal jurisdiction must comply with Constitutional due process in addition to satisfying

the requirements of New York's long-arm jurisdiction statute.
*See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485-86 (1985)
("the facts of each case must [always] be weighed in determining
whether personal jurisdiction would comport with fair play and
substantial justice") (internal quotation and citation omitted)
(alteration in original).  The due process requirement, as set
forth in *International Shoe Company v. Washington*, 326 U.S. 310
(1945), "protects a person without meaningful ties to the forum
state from being subjected to binding judgments within its
jurisdiction."  *Metro. Life Ins. Co.*, 84 F.3d at 567.  The due
process test has two prongs: "minimum contacts" and
"reasonableness."  *Chloe*, 616 F.3d at 171.

### 1. Minimum Contacts

"[T]he minimum contacts inquiry overlaps significantly
with the 'transaction of business' inquiry under CPLR Section
302(a)(1)."  *Thorsen v. Sons of Norway*, No. 13-CV-2572, 2014
U.S. Dist. LEXIS 15283, at *27 (E.D.N.Y. Feb. 6, 2014); *see also*
*Best Van Lines*, 490 F.3d at 247 ("It may be that the meaning of
'transact[ing] business' for the purposes of section 302(a)(1)
overlaps significantly with the constitutional 'minimum
contacts' doctrine.") (citing New York cases).  "However,
because New York's long-arm statute encompasses a wider range of
activity than the minimum-contacts doctrine, the Court must
undertake an additional analysis under the due process clause."

*Thorsen*, 2014 U.S. Dist. LEXIS 15283 at \*27; *see also Best Van Lines*, 490 F.3d at 248 ("Some distance remains between the jurisdiction permitted by the Due Process Clause and that granted by New York's long-arm statute.").

"To establish the minimum contacts necessary to comport with the due process clause, the Court must determine that the defendant 'purposefully avail[ed]' himself of the privilege of doing business in New York such that the defendant 'should reasonably anticipate being haled into court there.'" *Id.* at \*27 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, (1980)); *see also Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 242-243 (2d Cir. 1999) (same).

For substantially the same reasons as set forth above in Discussion section II.B.2, the court finds that defendants purposefully availed themselves of the privilege of conducting business activities in New York and, thus, satisfy the "minimum contacts" inquiry of the Due Process Clause. Specifically, defendants travelled to New York and negotiated a contract in New York that required an ongoing business relationship with an individual and business in New York and the remittance of funds to New York. *See supra* Discussion section II.B.2. Consequently, it was reasonably foreseeable to defendants that they could be haled into New York for a breach of contract

action arising from the contract they negotiated with the New York-based plaintiffs in New York.[10]

## 2. Reasonableness

The assertion of jurisdiction must also "comport[] with 'traditional notions of fair play and substantial justice' that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Int'l Shoe*, 326 U.S. at 316)). The Second Circuit has outlined five "reasonableness" factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.
>
> *Id.*

Defendants, who are domiciled in India, will incur some burden as a result of having to defend this action in New York. (Marya Dec. ¶¶ 44-49.) "Although this burden is substantially diminished in today's modern age, it remains an important factor." *Thorsen*, 2014 U.S. Dist. LEXIS 15283 at *29; *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,

---

[10] As explained n Discussion section II.B.2, the court finds that plaintiffs have made a *prima facie* case that they had not agreed to arbitrate this case under the laws of India.

305 F.3d 120, 129-30 (2d Cir. 2002) ("the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago") (internal quotation and citation omitted). But defendants are already represented by counsel in New York and have travelled to the state at least two times in connection with the underlying events of this case, which "undercuts any claim of undue hardship or burden on these defendants." *Thorsen*, 2014 U.S. Dist. LEXIS 15283 at *30. To the extent any witnesses require translators in Hindi, such translators are readily available in this district and the court expects that defendants will be able to continue the operations of their businesses through modern communications and technology when they are in New York for any court proceedings.

The court finds that New York has a strong interest in having this case adjudicated in New York because it has a significant interest "in providing effective means of redress" for plaintiffs, who are residents of New York state. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).

Here, Bhatara, a New York resident and citizen, and USHA, a New York LLC, have been deprived of a License for which Bhatara paid $400,000 to transfer to a joint venture in order to receive 50 percent of the shares in the joint venture, profits from the joint venture, and a role in the management of the joint venture. The court also finds that plaintiffs, including

Bhatara, who suffers from cerebral palsy and would thus be physically and economically burdened by the costs and difficulties of travel to India and in Indi, (Bhatara Dec. ¶¶ 97-98), have a very strong interest in obtaining relief in the forum state where they reside and allegedly entered into a contract with defendants.

The fourth and fifth factors do not weigh in favor of either party. The court notes that the Eastern District of New York is fully capable of handling this case and that it has already found that plaintiffs have established a *prima facie* case that they did not agree to arbitrate issues arising out of the contract under the laws of India. *See supra* Discussion section II.B.2

After considering these factors, the court finds that defendants' "generalized complaints of inconvenience arising from having to defend [themselves] from suit in New York do not add up to 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable,'" *Chloe*, 616 F.3d at 173 (quoting *Metro Life Ins. Co*, 84 F.3d at 568), and that the exercise of jurisdiction in this case would "comport[] with traditional notions of fair play and substantial

justice," *Metro. Life Ins. Co.*, 84 F.3d at 568 (internal quotation and citation omitted).[11]

### III. *Forum Non Conveniens*

"The doctrine of *forum non conveniens* permits a court to dismiss a claim even if the court is a *permissible* venue with proper jurisdiction over the claim." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) (emphasis in original); *see also Sinochem Int'l v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007) ("a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy" pursuant to the doctrine of *forum non conveniens*). Under the doctrine, "[t]he defendant bears the burden of demonstrating why the plaintiffs' choice of forum should be disturbed." *Chirag v. MT Marida Marguerite Schiffahrts*, No. 3:12cv00879, 2013 U.S. Dist. LEXIS 162877, at *10 (D. Conn. Nov. 15, 2013) (*citing Karvelis v. Constellation Lines SA*, 608 F. Supp. 966, 971-72 (S.D.N.Y. 1985), *aff'd*, 806 F.2d 49 (2d Cir. 1986)).

District courts have broad discretion to determine "where litigation will be most convenient" and where it "will

_____

[11] The court also notes that venue is also proper in the Eastern District of New York because Marya, as a defendant not resident in the United States, may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3), and Franchise India and FAPL may be sued in this district pursuant to 28 U.S.C. § 1391(c)(2) because this court has determined it has personal jurisdiction over them.

serve the ends of justice." *PT United Can*, 138 F.3d at 73. But
the Second Circuit has provided a "three-step process to guide
the exercise of that discretion." *Norex Petroleum Ltd. v.
Access Indus.,* 416 F.3d 146, 153 (2d Cir. 2005). First, the
court must decide the degree of deference to award the
plaintiff's choice of forum. *Id.* Second, the court must
determine whether an adequate and available alternate forum
exists in which the case may be heard. *Id.* Third, the court
must balance the private and public interest factors identified
by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501
(1947).

     The private interest factors include ease of access to
sources of proof, access to witnesses, where the evidence is
located, enforceability of a potential judgment, and "all other
practical problems that make trial of a case easy, expeditious
and inexpensive." *Id.* at 508. The public interest factors
include the administrative burden of litigating a case with a
center of gravity that lies elsewhere, the difficulties of
untangling problems in conflict of laws and making
determinations about foreign law, the burden of a jury of
deciding an essentially foreign case, and the "local interest in
having localized controversies decided at home." *Id.* at 508-09.

## A. Plaintiffs' Choice of Forum

The court finds, based on plaintiffs' assertions and evidence discussed at length in this opinion, that plaintiffs have chosen to file the suit in New York because they are residents of New York and would incur substantial inconvenience, hardship, and expense if they had to litigate this case in India as a result of the expenses and physical difficulties of travelling to India due to the fact that Bhatara suffers from cerebral palsy and has limited resources. Because plaintiffs have a "bona fide connection to the United States and to the forum of choice," the court gives substantial deference to plaintiffs' choice of forum in this case. *Chirag*, 2013 U.S. Dist. LEXIS 162877 at *12 (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc)); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.23 (1981) (indicating that the choice of forum by its citizens and residents deserves greater deference than a stranger's choice); *Koster v. (Am.) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947) ("[A] real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.").

## B. Alternate Forum

"An alternate forum ordinarily is available and adequate if the defendants are amenable to process there and it

permits litigation of the subject matter of the dispute."
*Chirag*, 2013 U.S. Dist. LEXIS 162877 at *16 (citing *Pollux
Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir.
2003)).  The court finds that Indian courts would be an adequate
and alternate forum to this dispute, given that it has also
determined that plaintiffs' tort claim of conversion should be
dismissed, *see infra* Discussion section V, and that defendants
would be amenable to process in India.

### C. Private and Public Interest Factors

The private interest factors in this case do not favor
dismissal.  Defendants have stated they do not have assets in
this country.  Still, most of the facts giving rise to this case
appear to have occurred in New York or over electronic
communications between the New York plaintiffs and the
defendants in India, a large part of the evidence will concern
e-mails and documents, many of which have already been produced
to the court, and relatively few witnesses will likely be
required for trial other than Marya and Bhatara.  Although
defendants have contested service, the court has found that they
were properly served, and they have all retained New York
counsel in this case. *See supra* Discussion section I.  To the
extent any foreign witnesses require translators, including
Hindi translators, such translators are, as previously stated,
readily available in this district.

The public interest factors also do not favor dismissal. The center of gravity of this case lies in New York, where the parties purportedly reached a meeting of the minds concerning a contract. Accordingly, there will likely be no serious concerns about making determinations about foreign laws or deciding a foreign case. There is also a strong local interest in deciding this controversy, which, despite all of its international overtones, is decidedly local in that it calls for factfinders to determine whether the parties entered into an agreement on November 2, 2008, during a dinner at the BLT Steakhouse in White Plains, New York, and then travelled to Illinois to enter into the License Agreement pursuant to their joint venture.

Because the public interest factors and the private interest factors do not favor dismissal, and the court gives strong deference to plaintiffs' choice of forum in this case, the court denies defendants' motion to dismiss pursuant to the doctrine of *forum non conveniens* despite the availability of an alternate adequate forum.

### IV. Motion to Dismiss Breach of Contract Claim

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . . While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 678-79.

The Second Circuit has "articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). The should consider:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

> *Id.*

Finally, a "breach of contract claim will be dismissed where a plaintiff fails to allege 'the essential terms of the parties' purported contract, including the specific provisions

of the contract upon which liability is predicated.'" *Aleph Towers, LLC*, 2013 U.S. Dist. LEXIS 120284, at *20 (quoting *Martinez v. Vakko Holding A.S.,* No. 07 Civ. 3413, 2008 U.S. Dist. LEXIS 56274, at *5 (S.D.N.Y. July 23, 2008)).

The court has already addressed the issue of whether the parties entered into a contract extensively in Discussion section II.B.2 and determined that plaintiffs have made a *prima facie* case that Marya travelled to New York to negotiate an agreement with Bhatara and USHA on behalf of himself, Franchise India, and FAPL, on November 2, 2008 and that defendants entered into an contractual agreement with plaintiffs on that date that required them to send payments to plaintiffs in New York.

After applying the factors specified by the Second Circuit in *Winston*, the court finds that, for the reasons provided in Discussion section II.B.2, the draft Commercial Agreement specified it was only a draft and the parties were discussing a complicated business agreement that would usually be committed to a writing. But Marya and Bhatara partially performed on the contract by taking steps to transfer the License to FAPL, and many of the material terms of the contract had been agreed upon. Thus, after reviewing the Complaint and drawing all reasonable inferences in favor of the plaintiffs, the court finds that plaintiffs have sufficiently alleged at this stage of the litigation that defendants breached the

agreement by "refus[ing] to share profits from the License, and [not] allow[ing] the Plaintiffs to participate in the management of [FAPL]." (Complaint ¶ 36.)

Defendants' statute of frauds argument also fails. Defendants argue that New York's statute of frauds applies to this case because Article 6.1 of the draft Commercial Agreement states that "investments by the parties as toward the JV shall be locked in for a period of 2 years from the date of investment by [USHA] in the JV." (Mem. at 29; Marya Dec., Ex. C at p. 8.) Under New York's statute of frauds, as set forth in New York General Obligations Law § 5-701(a)(1), "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged" if the agreement "[b]y its terms is not to be performed within one year from the making thereof." N.Y. Gen. Oblig. L. § 5-701(a)(1) (2014).[12] "The statute encompasses only those agreements which, by their terms, have *absolutely no possibility in fact and law* of full performance within one year." *Foster v. Kovner*, 840 N.Y.S.2d 328, 331 (N.Y. App. Div. 2007) (internal quotation and citation omitted).

---

[12] Article 12.1, which provides for the "Term of the Agreement," does not require the parties to be bound by the draft Commercial Agreement for any fixed period of time because the space in which the parties could have filled in a fixed time period for the agreement is blank. (Marya Dec., Ex. C at p. 13.) In addition, Article 12.3 provides that the parties "may agree to terminate this Agreement at anytime by mutual consent." (*Id.*)

Still, "oral agreements that violate the Statute of
Frauds are nonetheless enforceable where the party to be charged
admits having entered into the contract." *Matisoff v. Dobi*, 681
N.E.2d 376, 380 (N.Y. 1997) (citing *Cohon & Co. v. Russell*, 245
N.E.2d 712, 715-16 (N.Y. 1969)); *see also Ravnikar v. Latif*, No.
CV-07-1360, 2010 U.S. Dist. LEXIS 106221, at *11-12 (E.D.N.Y.
Oct. 5, 2010) (same); *Taussig v. Clipper Grp., L.P.*, 790
N.Y.S.2d 602, 602 (N.Y. App. Div. 2005) (same); *see also Cole v.
Macklowe*, 836 N.Y.S.2d 568, 571 (N.Y. App. Div. 2007) ("the
statute was not enacted to enable defendants to interpose it as
a bar to a contract fairly and admittedly made"). Consequently,
the statute of frauds would not apply in this case because Marya
has admitted entering into a joint venture with plaintiffs in
his e-mail to Bhatara on November 8, 2008, in which he stated "I
am very excited about our new business partnership and am sure
this new joint venture will be very fruitful and beneficial to
our organizations." (Bhatara Dec. ¶ 35 & Ex. C.)

Even if the statute of frauds did apply, "an agreement
sufficient to satisfy the statute of frauds may be pieced
together from separate writings" so long as "the separate
writings together refer to the same subject matter or
transaction and unequivocally establish all the essential
elements of the contractual relationship . . . such as price,
terms, parties and a description of the subject matter" and

"[a]t least one of the writings . . . bear[s] the signature of the party to be charged." *MMT Sales, LLC v Acme Tel. Holdings, LLC*, No. 602156/09, 2011 N.Y. Misc. LEXIS 1170, at *12 (N.Y. Sup. Ct. Mar. 21, 2011) (internal quotations and citations omitted) (collecting cases); *see also Crabtree v. Elizabeth Arden Sales Corp.*, 110 N.E.2d 551, 553 (N.Y. 1953) ("The statute of frauds does not require the memorandum to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion.") (internal quotation and citation omitted).

Here, the statute of frauds requirement is satisfied by the draft Commercial Agreement sent to Bhatara by the legal advisor for Franchise India, (Marya Dec., Ex. C), which was substantially similar to, and contained the essential and material terms of, the agreement Marya and Bhatara discussed and purportedly reached on November 2, 2008. Furthermore, Marya's November 8, 2008 e-mail to Bhatara, in which he stated "I am very excited about our new business partnership and am sure this new joint venture will be very fruitful and beneficial to our organizations," (Bhatara Dec. ¶ 35 & Ex. C), and Marya's e-mail dated November 14, 2008, requesting Bhatara's signature on a document in furtherance of the joint venture, (*id.* ¶ 37 & Ex. D), are additional writings that satisfy the statute of frauds.

Therefore, defendants' motion to dismiss the breach of contract claim under Federal Rule of Civil Procedure 12(b)(6) is denied.[13]

## V. Motion to Dismiss Conversion Claim

Finally, defendants have moved to dismiss plaintiffs' conversion claim, arguing it is barred by the statute of limitations of three years in CPLR § 214(3) and is duplicative of the breach of contract claim. (Mem. at 29-30.) Defendants argue that the conversion claim accrued on November 14, 2008, the date from which, as plaintiffs allege in the Complaint, "Marya refused to communicate with the [P]laintiffs regarding the License/Licensee," (Complaint ¶ 33), and was time barred by November 14, 2011, well before plaintiffs filed suit in June 2012.

"New York applies a three-year statute of limitations for conversion." *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 179 (E.D.N.Y. 2010) (citing N.Y.C.P.L.R. § 214(3)). "A cause of action for conversion accrues when all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court." *State of New York v. Seventh Regiment Fund*, 774 N.E.2d 702, 710 (N.Y. 2002) (quotation and citation omitted).

---

[13] The court also notes Bhatara has standing to bring this lawsuit because he has averred that the agreement was between Bhatara and USHA and defendants. (Complaint ¶¶ 22-23.)

To state a claim for conversion under New York law, a plaintiff must allege that "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011). "A cause of action for conversion is complete when the party in possession of the property openly interferes with the true owner's rights in it." *Bolton*, 757 F. Supp. 2d at 179. "With respect to intangible property, an interference occurs when the party in possession acts in a manner incompatible with the plaintiff's rights in the property." *Id.*

Significantly, "the statute of limitations on a claim of conversion . . . begins to accrue at the moment of conversion, regardless of when the conversion is discovered." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 440 (S.D.N.Y. 1999); *see also Vigilant Ins. Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (N.Y. 1995) ("accrual runs from the date the conversion takes place . . . and not from discovery or the exercise of diligence to discover"); *Sporn v. MCA Records*, 448 N.E.2d 1324, 1327 (N.Y. 1983) ("For the purposes of the Statute of

Limitations, if the action is one for conversion, the time period will run from when that cause of action accrued -- that is, when the conversion occurred."); *Maya NY, LLC v. Hagler*, 965 N.Y.S.2d 475, 477 (N.Y. App. Div. 2013) ("The cause of action normally accrues on the date the conversion takes place and not the date of discovery or the exercise of diligence to discover.") "Where the claim involves a plaintiff's property, whose possession by a defendant is 'originally lawful' but later becomes a 'wrongful withholding,' a demand that the property be returned is a procedural 'condition precedent' to asserting the claim." *Dudek v. Nassau Cnty. Sheriff's Dep't*, No. 12-CV-1193, 2013 U.S. Dist. LEXIS 164740, at *49-50 (E.D.N.Y. Nov. 19, 2013) (citing *Berman v. Goldsmith*, 529 N.Y.S.2d 115, 116 (N.Y. App. Div. 1988)). "The claim starts to accrue, as soon as a plaintiff has the 'right to make the demand.'" *Id.* at *50 (quoting N.Y.C.P.L.R. § 206(a)).

Plaintiffs argue that the claim for conversion did not arise until January 17, 2012, because Marya "strung . . . Bhatara along for several years, offering vague explanations as to why profits were not being distributed." (Opp. at 30.) This assertion is irrelevant because it only addresses *why* plaintiffs did not discover their claim for conversion at an earlier date but does not state *when* the conversion claim first began to accrue. In this case, plaintiffs alleged that defendants "have

improperly converted the License" by "excluding the Plaintiffs

from the management and use of the License," (Complaint ¶ 59),

and that, "[s]ubsequent to November 14, 2008," defendants

"refused to communicate with the Plaintiffs regarding the

License/Licensee," (*id.* ¶ 33).  Plaintiffs' cause of action for

conversion thus accrued on November 14, 2008, because defendants

allegedly began improperly excluding plaintiffs from the

management and use of the License on that date, and plaintiffs

had the right to make a demand for the License on that date.

(*Id.* ¶¶ 33-34, 59.)  As a result, plaintiffs' claim for

conversion is dismissed because plaintiffs did not file suit

until June 2012, after the statute of limitations of three years

for the conversion claim had expired on November 14, 2011.[14]

---

[14] Although the court has already held that plaintiffs' conversion claim is time-barred by the statute of limitations, the court notes that defendants also argue the conversion claim should be dismissed because it is duplicative of plaintiffs' breach of contract claim.  (Mem. at 30.)  "For a conversion claim to succeed in the context of a dispute regarding a contract . . . the breach of contract must result in some 'wrong' that is separately actionable."  *Lefkowitz v. Reissman*, No. 12 Civ. 8703, 2014 U.S. Dist. LEXIS 30845, at *30 (S.D.N.Y. Mar. 7, 2014) (quoting *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001)).  A conversion claim is *not* duplicative of a contract claim, however, where "success on the conversion claim may entitle Plaintiff to special damages." *Bolton*, 757 F. Supp. 2d at 178.  "Punitive damages may be recovered for an act of conversion where the circumstances establish that the conversion was accomplished by malice or reckless or willful disregard of the plaintiff's right."  *Id.*  In this case, success on the conversion claim may have entitled plaintiffs to special damages because plaintiffs have alleged that defendants' conduct was "so egregious that it shocks the conscience," (Complaint ¶ 60), and was therefore done with sufficient malice for the awarding of punitive damages, which plaintiffs also sought, (*id.* ¶ 66).

## CONCLUSION

For the foregoing reasons, the court grants defendants' motion to dismiss plaintiffs' claim for conversion, denies defendants' motion to dismiss plaintiffs' claim for breach of contract, and denies defendants' motion to dismiss the case for improper service, lack of personal jurisdiction, and *forum non conveniens*.  The parties are ordered to appear in court for a status conference at 9:30 a.m. on April 8, 2014.

SO ORDERED.

Dated:  Brooklyn, New York
       March 27, 2014

                                 /s/
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York